Filed 4/30/18

# IN THE SUPREME COURT OF CALIFORNIA

DYNAMEX OPERATIONS WEST, INC., )
        Petitioner, )
                        )             S222732
        v. )
                        )       Ct.App. 2/7 B249546
THE SUPERIOR COURT OF )
LOS ANGELES COUNTY, )      Los Angeles County
        Respondent; )     Super Ct. No. BC332016
                        )
CHARLES LEE et al., )
        Real Parties in Interest. )
_____ )

Under both California and federal law, the question whether an individual worker should properly be classified as an employee or, instead, as an independent contractor has considerable significance for workers, businesses, and the public generally.[1]  On the one hand, if a worker should properly be classified as an employee, the hiring business bears the responsibility of paying federal Social Security and payroll taxes, unemployment insurance taxes and state employment taxes, providing worker's compensation insurance, and, most relevant for the

_____

[1]  See United States Department of Labor, *Commission on the Future of Worker-Management Relations* (1994) page 64 ["The single most important factor in determining which workers are covered by employment and labor statutes is the way the line is drawn between employees and independent contractors"] <https://digitalcommons.ilr.cornell.edu/key_workplace/2/> (as of Apr. 30, 2018).

1

present case, complying with numerous state and federal statutes and regulations governing the wages, hours, and working conditions of employees. The worker then obtains the protection of the applicable labor laws and regulations. On the other hand, if a worker should properly be classified as an independent contractor, the business does not bear any of those costs or responsibilities, the worker obtains none of the numerous labor law benefits, and the public may be required under applicable laws to assume additional financial burdens with respect to such workers and their families.

Although in some circumstances classification as an independent contractor may be advantageous to workers as well as to businesses, the risk that workers who should be treated as employees may be improperly misclassified as independent contractors is significant in light of the potentially substantial economic incentives that a business may have in mischaracterizing some workers as independent contractors. Such incentives include the unfair competitive advantage the business may obtain over competitors that properly classify similar workers as employees and that thereby assume the fiscal and other responsibilities and burdens that an employer owes to its employees. In recent years, the relevant regulatory agencies of both the federal and state governments have declared that the misclassification of workers as independent contractors rather than employees is a very serious problem, depriving federal and state governments of billions of dollars in tax revenue and millions of workers of the labor law protections to which they are entitled.[2]

---

[2]    See United States Department of Labor, Wage & Hour Division, *Misclassification of Employees as Independent Contractors* <https://www.dol.gov/whd/workers/misclassification/> (as of Apr. 30, 2018); California Department of Industrial Relations, *Worker Misclassification* <http://www.dir.ca.gov/dlse/worker_misclassification.html> (as of Apr. 30, 2018);

*(footnote continued on next page)*

The issue in this case relates to the resolution of the employee or independent contractor question in one specific context.  Here we must decide what standard applies, under California law, in determining whether workers should be classified as employees or as independent contractors *for purposes of California wage orders*, which impose obligations relating to the minimum wages, maximum hours, and a limited number of very basic working conditions (such as minimally required meal and rest breaks) of California employees.[3]

In the underlying lawsuit in this matter, two individual delivery drivers, suing on their own behalf and on behalf of a class of allegedly similarly situated drivers, filed a complaint against Dynamex Operations West, Inc. (Dynamex), a nationwide package and document delivery company, alleging that Dynamex had misclassified its delivery drivers as independent contractors rather than employees. The drivers claimed that Dynamex's alleged misclassification of its drivers as independent contractors led to Dynamex's violation of the provisions of Industrial Welfare Commission wage order No. 9, the applicable state wage order governing the transportation industry, as well as various sections of the Labor Code, and, as a result, that Dynamex had engaged in unfair and unlawful business practices under Business and Professions Code section 17200.

---

*(footnote continued from previous page)*

see also National Employment Law Project, Independent Contractor Misclassification Imposes Huge Costs on Workers and Federal and State Treasuries (July 2015) pp. 2-6 <http://nelp.org/content/uploads/Independent-Contractor-Costs.pdf> (as of Apr. 30, 2018).

[3]    In California, wage orders are constitutionally-authorized, quasi-legislative regulations that have the force of law.  (See Cal. Const., art. XIV, § 1; Lab. Code, §§ 1173, 1178, 1178.5, 1182, 1185; *Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 700-703 (*Industrial Welf. Com.*).)

Prior to 2004, Dynamex classified as employees drivers who allegedly performed similar pickup and delivery work as the current drivers perform. In 2004, however, Dynamex adopted a new policy and contractual arrangement under which all drivers are considered independent contractors rather than employees. Dynamex maintains that, in light of the current contractual arrangement, the drivers are properly classified as independent contractors.

After an earlier round of litigation in which the trial court's initial order denying class certification was reversed by the Court of Appeal (*Lee v. Dynamex, Inc.* (2008) 166 Cal.App.4th 1325), the trial court ultimately certified a class action embodying a class of Dynamex drivers who, during a pay period, did not themselves employ other drivers and did not do delivery work for other delivery businesses or for the drivers' own personal customers. In finding that the relevant common legal and factual issues relating to the proper classification of the drivers as employees or as independent contractors predominated over potential individual issues, the trial court's certification order relied upon the three alternative definitions of "employ" and "employer" set forth in the applicable wage order as discussed in this court's then-recently decided opinion in *Martinez v. Combs* (2010) 49 Cal.4th 35, 64 (*Martinez*). As described more fully below, *Martinez* held that "[t]o employ . . . under the [wage order], has three alternative definitions. It means: (a) to exercise control over the wages, hours, or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." (49 Cal.4th at p. 64.) The trial court rejected Dynamex's contention that in the wage order context, as in most other contexts, the multifactor standard set forth in this court's seminal decision in *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341 (*Borello*) is the only appropriate standard under California law for distinguishing employees and independent contractors.

4

In response to the trial court's denial of Dynamex's subsequent motion to decertify the class, Dynamex filed the current writ proceeding in the Court of Appeal, maintaining that two of the alternative wage order definitions of "employ" relied upon by the trial court do not apply to the employee or independent contractor issue. Dynamex contended, instead, that those wage order definitions are relevant only to the distinct joint employer question that was directly presented in this court's decision in *Martinez* — namely whether, when a worker is an admitted employee of a primary employer, another business or entity that has some relationship with the primary employer should properly be considered a joint employer of the worker and therefore also responsible, along with the primary employer, for the obligations imposed by the wage order.

The Court of Appeal rejected Dynamex's contention, concluding that neither the provisions of the wage order itself nor this court's decision in *Martinez* supported the argument that the wage order's definitions of "employ" and "employer" are limited to the joint employer context and are not applicable in determining whether a worker is a covered employee, rather than an excluded independent contractor, for purposes of the obligations imposed by the wage order. The Court of Appeal concluded that the wage order definitions discussed in *Martinez* are applicable to the employee or independent contractor question with respect to obligations arising out of the wage order. The Court of Appeal upheld the trial court's class certification order with respect to all of plaintiffs' claims that are based on alleged violations of the wage order.

At the same time, the Court of Appeal concluded that insofar as the causes of action in the complaint seek reimbursement for business expenses such as fuel and tolls that are not governed by the wage order and are obtainable only under

5

section 2802 of the Labor Code,[4] the *Borello* standard is the applicable standard for determining whether a worker is properly considered an employee or an independent contractor. With respect to plaintiffs' non-wage-order claim under section 2802, the Court of Appeal remanded the matter to the trial court to reconsider its class certification of that claim pursuant to a proper application of the *Borello* standard as further explicated in this court's decision in *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522 (*Ayala*).

Dynamex filed a petition for review in this court, challenging only the Court of Appeal's conclusion that the wage order definitions of "employ" and "employer" discussed in *Martinez* are applicable to the question whether a worker is properly considered an employee or an independent contractor for purposes of the obligations imposed by an applicable wage order. We granted review to consider that issue.[5]

For the reasons discussed below, we agree with the Court of Appeal that the trial court did not err in concluding that the "suffer or permit to work" definition of "employ" contained in the wage order may be relied upon in evaluating whether

---

[4] Unless otherwise specified, all further statutory references are to the Labor Code.

[5] In their answer brief filed in this court, the drivers challenge the Court of Appeal's conclusion that the *Borello* standard is applicable to their cause of action under section 2802 insofar as that claim seeks reimbursement for business expenses other than business expenses encompassed by the wage order. The drivers contend that the wage order definitions should apply to all the relief sought under section 2802, maintaining that the obligation to reimburse business expenses is necessary to preclude circumvention of the minimum and overtime wage obligations imposed by the wage order. The drivers, however, did not seek review of that aspect of the Court of Appeal decision or file an answer to the petition for review requesting review of that issue. Accordingly, that issue is not before us and we express no view on that question. (Cal. Rules of Court, rules 8.500(a), 8.516(b).)

a worker is an employee or, instead, an independent contractor for purposes of the obligations imposed by the wage order. As explained, in light of its history and purpose, we conclude that the wage order's suffer or permit to work definition must be interpreted broadly to treat as "employees," and thereby provide the wage order's protection to, *all* workers who would ordinarily be viewed as *working in the hiring business*. At the same time, we conclude that the suffer or permit to work definition is a term of art that cannot be interpreted literally in a manner that would encompass within the employee category the type of individual workers, like independent plumbers or electricians, who have traditionally been viewed as *genuine* independent contractors who are working only in their own independent business.

For the reasons explained hereafter, we conclude that in determining whether, under the suffer or permit to work definition, a worker is properly considered the type of independent contractor to whom the wage order does not apply, it is appropriate to look to a standard, commonly referred to as the "ABC" test, that is utilized in other jurisdictions in a variety of contexts to distinguish employees from independent contractors. Under this test, a worker is properly considered an independent contractor to whom a wage order does not apply only if the hiring entity establishes: (A) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of such work and in fact; (B) that the worker performs work that is outside the usual course of the hiring entity's business; and (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity.

Although, as we shall see, it appears from the class certification order that the trial court may have interpreted the wage order's suffer or permit to work

7

standard too literally, we conclude that on the facts disclosed by the record, the trial court's certification order is nonetheless correct as a matter of law under a proper understanding of the suffer or permit to work standard and should be upheld.

Accordingly, we conclude that the judgment of the Court of Appeal should be affirmed.

## I. FACTS AND PROCEEDINGS BELOW

We summarize the facts as set forth in the prior Court of Appeal opinions in this matter, supplemented by additional facts set forth in the record.

Dynamex is a nationwide same-day courier and delivery service that operates a number of business centers in California. Dynamex offers on-demand, same-day pickup and delivery services to the public generally and also has a number of large business customers — including Office Depot and Home Depot — for whom it delivers purchased goods and picks up returns on a regular basis. Prior to 2004, Dynamex classified its California drivers as employees and compensated them pursuant to this state's wage and hour laws. In 2004, Dynamex converted all of its drivers to independent contractors after management concluded that such a conversion would generate economic savings for the company. Under the current policy, all drivers are treated as independent contractors and are required to provide their own vehicles and pay for all of their transportation expenses, including fuel, tolls, vehicle maintenance, and vehicle liability insurance, as well as all taxes and workers' compensation insurance.

Dynamex obtains its own customers and sets the rates to be charged to those customers for its delivery services. It also negotiates the amount to be paid to drivers on an individual basis. For drivers who are assigned to a dedicated fleet or scheduled route by Dynamex, drivers are paid either a flat fee or an amount based on a percentage of the delivery fee Dynamex receives from the customer.

8

For those who deliver on-demand, drivers are generally paid either a percentage of the delivery fee paid by the customer on a per delivery basis or a flat fee basis per item delivered.

Drivers are generally free to set their own schedule but must notify Dynamex of the days they intend to work for Dynamex. Drivers performing on-demand work are required to obtain and pay for a Nextel cellular telephone through which the drivers maintain contact with Dynamex. On-demand drivers are assigned deliveries by Dynamex dispatchers at Dynamex's sole discretion; drivers have no guarantee of the number or type of deliveries they will be offered. Although drivers are not required to make all of the deliveries they are assigned, they must promptly notify Dynamex if they intend to reject an offered delivery so that Dynamex can quickly contact another driver; drivers are liable for any loss Dynamex incurs if they fail to do so. Drivers make pickups and deliveries using their own vehicles, but are generally expected to wear Dynamex shirts and badges when making deliveries for Dynamex, and, pursuant to Dynamex's agreement with some customers, drivers are sometimes required to attach Dynamex and/or the customer's decals to their vehicles when making deliveries for the customer. Drivers purchase Dynamex shirts and other Dynamex items with their own funds.[6]

In the absence of any special arrangement between Dynamex and a customer, drivers are generally free to choose the sequence in which they will make deliveries and the routes they will take, but are required to complete all assigned deliveries on the day of assignment. If a customer requests, however,

---

[6]    Although several drivers indicated in depositions that they did not wear Dynamex shirts when making deliveries for Dynamex, it is undisputed that Dynamex retains the authority to require drivers to wear such shirts by agreeing to such a condition with the customer to whom a pick-up or delivery is to be made.

drivers must comply with a customer's requirements regarding delivery times and sequence of stops.

Drivers hired by Dynamex are permitted to hire other persons to make deliveries assigned by Dynamex. Further, when they are not making pickups or deliveries for Dynamex, drivers are permitted to make deliveries for another delivery company, including the driver's own personal delivery business. Drivers are prohibited, however, from diverting any delivery order received through or on behalf of Dynamex to a competitive delivery service.

Drivers are ordinarily hired for an indefinite period of time but Dynamex retains the authority to terminate its agreement with any driver without cause, on three days' notice. And, as noted, Dynamex reserves the right, throughout the contract period, to control the number and nature of deliveries that it offers to its on-demand drivers.

In January 2005, Charles Lee — the sole named plaintiff in the original complaint in the underlying action — entered into a written independent contractor agreement with Dynamex to provide delivery services for Dynamex. According to Dynamex, Lee performed on-demand delivery services for Dynamex for a total of 15 days and never performed delivery service for any company other than Dynamex. On April 15, 2005, three months after leaving his work at Dynamex, Lee filed this lawsuit on his own behalf and on behalf of similarly situated Dynamex drivers.

In essence, the underlying action rests on the claim that, since December 2004, Dynamex drivers have performed essentially the same tasks in the same manner as when its drivers were classified as employees, but Dynamex has improperly failed to comply with the requirements imposed by the Labor Code and wage orders for employees with respect to such drivers. The complaint alleges five causes of action arising from Dynamex's alleged misclassification of

10

employees as independent contractors: two counts of unfair and unlawful business practices in violation of Business and Professions Code section 17200, and three counts of Labor Code violations based on Dynamex's failure to pay overtime compensation, to properly provide itemized wage statements, and to compensate the drivers for business expenses.

The trial court's initial order denying class certification was reversed by the Court of Appeal based on the trial court's failure to compel Dynamex to provide contact information for potential putative class members that would enable plaintiffs to establish the necessary elements for class certification. (See *Lee v. Dynamex*, *supra*, 166 Cal.App.4th 1325, 1336-1338.) After the trial court permitted plaintiffs to file a first amended complaint adding Pedro Chevez (a former Dynamex dedicated fleet driver) as a second named plaintiff and the parties stipulated to the filing of a second amended complaint (the current operative complaint), the parties agreed to send questionnaires to all putative class members seeking information that would be relevant to potential class membership.

Based on the responses on the questionnaires that were returned by current or former Dynamex drivers, plaintiffs moved for certification of a revised class of Dynamex drivers. As ultimately modified by the trial court, the proposed class includes those individuals (1) who were classified as independent contractors and performed pickup or delivery service for Dynamex between April 15, 2001 and the date of the certification order, (2) who used their personally owned or leased vehicles weighing less than 26,000 pounds, and (3) who had returned questionnaires which the court deemed timely and complete. The proposed class explicitly excluded, however, drivers for any pay period in which the driver had provided services to Dynamex either as an employee or subcontractor of another person or entity or through the driver's own employees or subcontractors (except for substitute drivers who provided services during vacation, illness, or other time

11

off).  Also excluded were drivers who provided services concurrently for Dynamex and for another delivery company that did not have a relationship with Dynamex or for the driver's own personal delivery customers.  Thus, as narrowed by these exclusions, the class consisted only of individual Dynamex drivers who had returned complete and timely questionnaires and who personally performed delivery services for Dynamex but did not employ other drivers or perform delivery services for another delivery company or for the driver's own delivery business.  The trial court's certification order states that 278 drivers returned questionnaires and that from the questionnaire responses it appears that at least 184 drivers fall within the proposed class.

On May 11, 2011, the trial court, in a 26-page order, granted plaintiffs' motion for class certification.  The validity of that order is at issue in the present proceeding.

After determining that the proposed class satisfied the prerequisites of ascertainability, numerosity, typicality, and adequacy of class representatives and counsel required for class certification, the trial court turned to the question of commonality — that is, whether common issues predominate over individual issues.  Because of its significance to our subsequent legal analysis, we discuss this aspect of the trial court's certification order in some detail.

The trial court began its discussion of the commonality requirement by observing that " '[t]he ultimate question in every [purported class action] is whether, given an ascertainable class, the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' "  The court noted that in examining whether common issues of law or fact predominate, a court must consider the legal theory on which plaintiffs' claim is based and the relevant facts that bear on that legal

12

theory. The court explained that in this case all of plaintiffs' causes of action rest on the contention that Dynamex misclassified the drivers as independent contractors when they should have been classified as employees. Thus, the facts that are relevant to that legal claim necessarily relate to the appropriate legal standard or test that is applicable in determining whether a worker should be considered an employee or an independent contractor.

The court then explained that the parties disagreed as to the proper legal standard that is applicable in determining whether a worker is an employee or an independent contractor for purposes of plaintiffs' claims. Plaintiffs relied on this court's then-recent decision in *Martinez*, *supra*, 49 Cal.4th 35, maintaining that the standards or tests for employment set forth in *Martinez* are applicable in the present context, and that the standard for determining the employee or independent contractor question set forth in this court's decision in *Borello*, *supra*, 48 Cal.3d 341 is not the sole applicable standard. Dynamex, by contrast, took the position that the alternative definitions of "employ" and "employer" discussed in *Martinez* are applicable only in determining whether an entity that has a relationship with the primary employer of an admitted employee should be considered a *joint employer* of the employee, and *not* in deciding whether a worker is properly classified as an employee or an independent contractor. Dynamex asserted that even with respect to claims arising out of the obligations imposed by a wage order, the question of a worker's status as an employee or independent contractor must be decided solely by reference to the *Borello* standard.

In its certification order, the trial court agreed with plaintiffs' position, relying on the fact that the *Martinez* decision "did not indicate that its analysis was in any way limited to situations involving questions of joint employment." The court found that the *Martinez* decision represents "a redefinition of the employment relationship under a claim of unpaid wages as follows: 'To employ,

13

then, under the IWC's [Industrial Welfare Commission's] definition, has three alternative definitions. It means (a) to exercise control over the wages, hours or working conditions, (b) to suffer or permit to work, or (c) to engage, thereby creating a common law employment relationship.' " (Quoting *Martinez*, *supra*, 49 Cal.4th at p. 64.) The trial court concluded that "[t]hese definitions must be considered when analyzing whether the class members are employees or independent contractors" and thereafter proceeded to discuss separately each of the three definitions or standards set forth in *Martinez* in determining whether common issues predominate for purposes of class certification.

With regard to the "exercise control over wages, hours or working conditions" test, the trial court stated that " 'control over wages' means that a person or entity has the power or authority to negotiate and set an employee's rate of pay" and that "[w]hether or not Dynamex had the authority to negotiate each driver's rate of pay can be answered by looking at its policies with regard to hiring drivers. . . . [I]ndividual inquiry is not required to determine whether Dynamex exercises control over drivers' wages."

With regard to the suffer or permit to work test, the trial court stated in full: "An employee is suffered or permitted to work if the work was performed with the knowledge of the employer. [Citation.] This includes work that was performed that the employer knew *or should have known* about. [Citation.] Again, this is a matter that can be addressed by looking at Defendant's policy for entering into agreement with drivers. Defendant is only liable to those drivers with whom it entered into an agreement (i.e., knew were providing delivery services to Dynamex customers). This can be determined through records, and does not require individual analysis."

With regard to the common law employment relationship test referred to in *Martinez*, the trial court stated that this test refers to the multifactor standard set

14

forth in *Borello*, *supra*, 48 Cal.3d 341. The trial court described the *Borello* test as involving the principal factor of " 'whether the person to whom services is rendered has the right to control the manner and means of accomplishing the result desired' " as well as the following nine additional factors: "(1) right to discharge at will, without cause; (2) whether the one performing the services is engaged in a distinct occupation or business; (3) the kind of occupation, with reference to whether in the locality the work is usually done under the direction of the principal or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (6) the length of time for which the services are to be performed; (7) method of payment, whether by the time or by the job; (8) whether or not the work is part of the regular business of the principal; and (9) whether or not the parties believe they are creating the relationship of employer-employee." As the trial court observed, *Borello* explained that " 'the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' " (*Borello*, *supra*, 48 Cal.3d at p. 351.)

The trial court then discussed the various *Borello* factors, beginning with whether the hiring business has the right to control work details. In analyzing this factor, the court stated: "A determination of control of the work details must look to 'all meaningful aspects of the business relationship.' [Citation.] For a delivery service, those aspects include obtaining customer/customer service, prices charged for delivery, routes, delivery schedules and billing. Plaintiffs contend that these factors are all controlled by Dynamex because it obtains the customers, maintains a centralized call system, maintains a package tracking system, sets the prices for

its services and customers are billed by Dynamex. This is not necessarily borne out by the evidence. Defendants' [supervising officer], Mr. Pople,[7] testified that the drivers solicit new customers. [Citation.] There is also evidence that customer service is handled by some of the drivers, depending on the customer's relationship to that driver. [Citation.] Finally, defendant does not necessarily control the drivers' delivery schedules, as a number of drivers state that their only obligation is to complete the deliveries by the end of the business day. [Citation.] The degree to which Dynamex controls the details of the work varies according to different circumstances, including the particular driver or customer that is involved. Determining whether Dynamex controls the details of the business, therefore, does not appear susceptible to common proof."

With regard to the right to discharge factor, the trial court stated: "[T]he right to discharge at will, without cause, is an important consideration. Defendant's [supervising officer] testified that Dynamex maintains the right to discharge the drivers at will. [Citation.] This does not appear to vary from driver to driver. So it is a classwide factor, which is particularly relevant to demonstrating the existence of an employer-employee relationship."

With regard to the "distinct occupation or business" factor, the trial court stated: "A distinct business relates to whether the drivers have the opportunity for profit and loss. [Citation.] Plaintiffs contend that the drivers have no opportunity for profit or loss because they are charged according to standardized rate tables. This may be a misrepresentation of defendants' evidence. Defendant['s supervising officer] testified that it tries to standardize the rates paid to on-demand

---

[7] Although the class certification order does not specify Pople's position, the record indicates that Pople was Dynamex's area vice president for the West, with management and supervisory authority over Dynamex's operations in California.

16

drivers, however, drivers enter into different compensation arrangements. [Citations.] The opportunity for profit or loss depends on the nature of the agreement negotiated between Dynamex and the particular driver. Each arrangement would have to be reviewed to determine the extent of the driver's opportunity for profit and loss."

With regard to the "who supplies instrumentalities" factor, the court stated: "Defendant admitted that the drivers had to provide the instrumentalities of their work and that this was a classwide policy. This factor is subject to common inquiry."

With regard to the duration of service factor, the court stated: "Defendants concede that the drivers are at-will. [This] [f]actor is also subject to common inquiry."

With regard to the method of payment factor, the court stated: "Defendants identify different payment scenarios: (a) percentage of the fee Dynamex charges its customer for each delivery performed; (b) flat rate per day, regardless of the number of packages delivered; (c) set amount per package, regardless of the size or type of package; (d) flat fee to be available to provide delivery service regardless of whether the Driver's services are used; or (e) a combination of these payment types. [Citation.] These factors vary from driver to driver and raise individualized questions."

Finally, with regard to the "parties' belief regarding the nature of relationship" factor, the court noted that "this factor is given less weight by courts" and stated "[a]ll the drivers signed agreements stating that they were independent contractors. The drivers' belief could reasonably be demonstrated through this classwide agreement."

The court then summarized its conclusion with regard to the *Borello* standard: "Thus, most of the secondary factors are subject to common proof and

do not require individualized inquiry of the class members.  But the main factor in determining whether an employment agreement exists — control of the details — does require individualized inquiries due to the fact that there is no indication of a classwide policy that only defendants obtain new customers, only the defendants provide customer service and create the delivery schedules."

With respect to the entire question of commonality, however, the trial court concluded:  "Common questions predominate the inquiry into whether an employment relationship exists between Dynamex and the drivers.  The first two alternative definitions of 'employer' can both be demonstrated through common proof, even if the common law test requires individualized inquiries."

Having found that common issues predominate, the trial court went on to conclude that "[a] class action is a superior means of conducting this litigation." The court stated in this regard:  "Given that there is evidence from Plaintiffs that common questions predominate the inquiry into [the] employment relationship[,] managing this as a class action with respect to those claims will be feasible.  There appears to be no litigation by individual class members, indicating that they have little interest in personally controlling their claims.  Finally, consolidating all the claims before a single court would be desirable since it would allow for consistent rulings with respect to all the class members' claims."

On the basis of its foregoing determinations, the trial court granted plaintiffs' motion for class certification.

In December 2012, Dynamex renewed its motion to decertify the class action that the trial court had certified in May 2011.  Dynamex relied upon intervening Court of Appeal decisions assertedly demonstrating that the trial court had erred in relying upon the wage order's alternative definitions of employment, as set forth in *Martinez*.  The trial court denied the renewed motion to decertify the class.

18

In June 2013, Dynamex filed a petition for writ of mandate in the Court of Appeal, challenging the trial court's denial of its motion to decertify the class. In response, plaintiffs, while disagreeing with Dynamex's claim that the trial court had erred, urged the Court of Appeal to issue an order to show cause and resolve the issues presented in the writ proceeding. The Court of Appeal issued an order to show cause in order to determine whether the trial court erred in certifying the underlying class action under the wage order definitions of "employ" and "employer" discussed in *Martinez*.

After briefing and argument, the Court of Appeal denied the petition in part and granted the petition in part. The appellate court concluded that the trial court properly relied on the alternative definitions of the employment relationship set forth in the wage order when assessing those claims in the complaint that fall within the scope of the applicable wage order, and it denied the writ petition with respect to those claims. With respect to those claims that fall outside the scope of the applicable wage order, however, the Court of Appeal concluded that the *Borello* standard applied in determining whether a worker is an employee or an independent contractor, and it granted the writ to permit the trial court to reevaluate its class certification order in light of this court's intervening decision in *Ayala*, *supra*, 59 Cal.4th 522, which clarified the proper application of the *Borello* standard.

As already noted, Dynamex's petition for review challenged only the Court of Appeal's conclusion that the trial court properly determined that the wage order's definitions of "employ" and "employer" may be relied upon in determining whether a worker is an employee or an independent contractor for purposes of the obligations imposed by the wage order. We granted the petition for review to consider that question.

19

## II. RELEVANT WAGE ORDER PROVISIONS

We begin with a brief review of the relevant provisions of the wage order that applies to the transportation industry.  (See Cal. Code Regs., tit. 8, § 11090.)

In describing its scope, the transportation wage order initially provides in subdivision 1:  "This order shall apply to all persons employed in the transportation industry, whether paid on a time, piece rate, commission, or other basis," except for persons employed in administrative, executive, or professional capacities, who are exempt from most of the wage order's provisions.  (Cal. Code Regs., tit. 8, § 11090, subd. 1.)[8]

Subdivision 2 of the order, which sets forth the definitions of terms as used in the order, contains the following relevant definitions:

"(D)  'Employ' means to engage, suffer, or permit to work.

"(E)  'Employee' means any person employed by an employer.

"(F)  'Employer' means any person as defined in Section 18 of the Labor Code, who directly or indirectly, or through an agent or any other person, employs

---

[8]     The order contains extensive provisions setting forth the requirements that apply "in determining whether an employee's duties meet the test to qualify for an exemption" under the executive, administrative, or professional category.  (Cal. Code Regs., tit. 8, § 11090, subd. 1 (A)(1)-(3).)  The professional category includes persons who are licensed and primarily engaged in the practice of law, medicine, dentistry, optometry, architecture, engineering, teaching, or accounting, or another learned or artistic profession.  (*Id.*, § 11090,  subd. 1 (A)(3)(a)-(g).)

The wage order also specifically exempts from its provisions, in whole or in part, (1) employees directly employed by the state or any political subdivision, (2) outside salespersons, (3) any person who is the parent, spouse, or child of the employer, (4) employees who have entered into a collective bargaining agreement under the federal Railway Labor Act, and (5) any individual participating in a national service program such as AmeriCorps.  (Cal. Code Regs., tit. 8, § 11090, subd. 1 (B)-(F).)

20

or exercises control over the wages, hours, or working conditions of any person." (Cal. Code Regs., tit. 8, § 11090, subd. 2(D)-(F).)[9]

Thereafter, the additional substantive provisions of the wage order that establish protections for workers or impose obligations on hiring entities relating to minimum wages, maximum hours, and specified basic working conditions (such as meal and rest breaks) are, by their terms, made applicable to "employees" or "employers." (See, e.g., Cal. Code Regs., tit. 8, § 11090, subds. 3 [Hours and Days of Work], 4 [Minimum Wages], 7 [Records], 11 [Meal Periods], 12 [Rest Periods].)

Subdivision 2 of the wage order does not contain a definition of the term "independent contractor," and the wage order contains no other provision that otherwise specifically addresses the potential distinction between workers who are employees covered by the terms of the wage order and workers who are

---

[9]     The definitions of "employ," "employee," and "employer" that appear in subdivision 2 of the transportation industry wage order are also included in the definitions set forth in each of the other 15 wage orders governing other industries in California, although several of the other industry wage orders include additional definitions of the term "employee." (See Cal. Code Regs., tit. 8, § 11010, subd. 2(D)-(F) [Manufacturing Industry]; *id.*, § 11020, subd. 2(D)-(F) [Personal Service Industry]; *id.*, § 11030, subd. 2(E)-(G) [Canning, Freezing, and Preserving Industry]; *id.*, § 11040, subd. 2(E)-(H) [Professional, Technical, Clerical, Mechanical, and Similar Occupations]; *id.*, § 11050, subd. 2(E)-(H) [Public Housekeeping Industry]; *id.*, § 11060, subd. 2(D)-(F) [Laundry, Linen Supply, Dry Cleaning, and Dyeing Industry]; *id.*, § 11070, subd. 2(D)-(F) [Mercantile Industry]; *id.*, § 11080, subd. 2(D)-(F) [Industries Handling Products After Harvest]; *id.*, § 11100, subd. 2(E)-(G) [Amusement and Recreation Industry]; *id.*, § 11110, subd. 2(E)-(G) [Broadcasting Industry]; *id.*, § 11120, subd. 2(D)-(F) [Motion Picture Industry]; *id.*, § 11130, subd. 2(D)-(F) [Industries Preparing Agricultural Products for Market, on the Farm]; *id.*, § 11140, subd. 2(C)-(G) [Agricultural Occupations]; *id.*, § 11150, subd. 2(E)-(G) [Household Occupations]; *id.*, § 11160, subd. 2(G)-(*I*) [On-Site Occupations].

21

independent contractors who are not entitled to the protections afforded by the wage order.

### III. BACKGROUND OF RELEVANT CALIFORNIA JUDICIAL DECISIONS

We next summarize the most relevant California judicial decisions, providing a historical review of the treatment of the employee or independent contractor distinction under California law.

The difficulty that courts in all jurisdictions have experienced in devising an acceptable general test or standard that properly distinguishes employees from independent contractors is well documented. As the United States Supreme Court observed in *Board v. Hearst Publications* (1944) 322 U.S. 111, 121: "Few problems in the law have given greater variety of application and conflict in results than the cases arising in the borderland between what is clearly an employer-employee relationship and what is clearly one of independent, entrepreneurial dealing. This is true within the limited field of determining vicarious liability in tort. It becomes more so when the field is expanded to include all of the possible applications of the distinction." (Fn. omitted.)

As the above quotation suggests, at common law the problem of determining whether a worker should be classified as an employee or an independent contractor initially arose in the tort context — in deciding whether the hirer of the worker should be held vicariously liable for an injury that resulted from the worker's actions. In the vicarious liability context, the hirer's right to supervise and control the details of the worker's actions was reasonably viewed as crucial, because " '[t]he extent to which the employer had a right to control [the details of the service] activities was . . . highly relevant to the question whether the employer ought to be legally liable for them . . . .' " (*Borello*, *supra*, 48 Cal.3d 341, 350.) For this reason, the question whether the hirer controlled the details of

22

the worker's activities became the primary common law standard for determining whether a worker was considered to be an employee or an independent contractor.

## A. Pre-*Borello* Decisions

Prior to this court's 1989 decision in *Borello*, *supra*, 48 Cal.3d 341, California decisions generally invoked this common law "control of details" standard beyond the tort context, even when deciding whether workers should be considered employees or independent contractors for purposes of the variety of 20th century social welfare legislation that had been enacted for the protection of employees. Thus, for example, in *Tieberg v. Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 946 (*Tieberg*), in determining whether a worker was an employee or independent contractor for purposes of California's unemployment insurance legislation, the court stated that "[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." (See also *Isenberg v. California Emp. Stab. Com.* (1947) 30 Cal.2d 34, 39 (*Isenberg*); *Perguica v. Ind. Acc. Com.* (1947) 29 Cal.2d 857, 859-861 (*Perguica*); *Empire Star Mines Co. v. Cal. Emp. Com.* (1946) 28 Cal.2d 33, 43 (*Empire Star Mines*).)

In addition to relying upon the control of details test, however, the pre-*Borello* decisions listed a number of "secondary" factors that could properly be considered in determining whether a worker was an employee or an independent contractor. The decisions declared that a hirer's right to discharge a worker "at will, without cause" constitutes " '[s]trong evidence in support of an employment relationship.' " (*Tieberg*, *supra*, 2 Cal.3d at p. 949, quoting *Empire Star Mines*, *supra*, 28 Cal.2d at p. 43.) The decisions also pointed to the following additional factors, derived principally from section 220 of the Restatement Second of Agency: "(a) whether or not the one performing services is engaged in a distinct

23

occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." (*Empire Star Mines*, *supra*, 28 Cal.2d at pp. 43-44; see also *Tieberg*, *supra*, 2 Cal.3d at p. 949; *Isenberg*, *supra*, 30 Cal.2d at p. 39; *Perguica*, *supra*, 29 Cal.2d at p. 860.)

Applying the control of details test and these secondary factors to the differing facts presented by each of the cases, this court found the workers in question to be employees in *Tieberg*, *supra*, 2 Cal.3d at pages 949-955 [television writers] and *Isenberg*, *supra*, 30 Cal.2d at pages 39-41 [horse racing jockeys], and independent contractors in *Perguica*, *supra*, 29 Cal.2d at pages 860-862 [lather hired by farmer to work on newly constructed house] and *Empire Star Mines*, *supra*, 28 Cal.2d at pages 44-46 [lessees of remote mining shaft]. (See also *Tomlin v. California Emp. Com.* (1947) 30 Cal.2d 118, 123 [lessees who placed and serviced vending machines held to be employees]; *Twentieth etc. Lites v. Cal. Dept. Emp.* (1946) 28 Cal.2d 56, 57-60 [outside salesmen of advertising signs who were free to work for competitors held to be employees]; *Cal. Emp. Com. v. L.A. etc. News Corp.* (1944) 24 Cal.2d 421, 424-425 [deliverers of advertising circular held to be employees].)

**B.** *Borello*

In 1989, in *Borello*, *supra*, 48 Cal.3d 341, this court addressed the employee or independent contractor question in an opinion that has come to be viewed as the seminal California decision on this subject. Because of the significance of this decision, we review the majority opinion in *Borello* at length.

The particular controversy in *Borello*, *supra*, 48 Cal.3d 341, concerned whether farmworkers hired by a grower to harvest cucumbers under a written "sharefarmer" agreement were independent contractors or employees for purposes of the California workers' compensation statutes. The grower contended that the farmworkers were independent contractors under the control of details test because the workers (1) were free to manage their own labor (the grower did not supervise the picking at all but compensated the workers based on the amount of cucumbers that they harvested), (2) shared the profit or loss from the crop, and (3) agreed in writing that they were not employees.

In rejecting the grower's contentions, the court in *Borello* summarized its conclusion in the introduction of the opinion as follows: "The grower controls the agricultural operations on its premises from planting to sale of the crops. It simply chooses to accomplish one integrated step in the production of one such crop by means of worker incentives rather than direct supervision. It thereby retains all necessary control over a job which can be done only one way. [¶] Moreover, so far as the record discloses, the harvesters' work, though seasonal by nature, follows the usual line of an employee. In no practical sense are the 'sharefarmers' entrepreneurs, operating independent businesses for their own accounts; they and their families are obvious members of the broad class to which workers' compensation protection is intended to apply." (*Borello*, *supra*, 48 Cal.3d at p. 345.) On this basis, the court concluded the workers were employees entitled to workers' compensation as a matter of law. (*Id.* at p. 346.)

25

In reaching these conclusions, the legal analysis employed by the *Borello* court is of particular significance. The court began by recognizing that "[t]he distinction between independent contractors and employees arose at common law to limit one's vicarious liability for the misconduct of a person rendering service to him" (*Borello*, *supra*, 48 Cal.3d at p. 350), and that it was in this context that "the 'control of details' test became the principal measure of the servant's status for common law purposes." (*Ibid.*) The court then took note of the prior California decisions discussed above, which generally utilized the common law control-of-details standard in determining whether workers were employees or independent contractors for purposes of social welfare legislation, but which also identified the numerous additional "secondary" factors listed above that may be relevant to that determination. (*Id.* at pp. 350-351.) The court observed that " 'the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' [Citation.]" (*Id*. at p. 351.)

Crucially, the court in *Borello* then went on to explain further that "the concept of 'employment' embodied in the [workers' compensation act] *is not inherently limited by common law principles*. We have acknowledged that the Act's definition of the employment relationship must be construed *with particular reference to the 'history and fundamental purposes' of the statute*. [Citation.]" (*Borello*, *supra*, 48 Cal.3d at p. 351, italics added.) The court observed that "[t]he common law and statutory purposes of the distinction between 'employees' and 'independent contractors' are substantially different" (*id.* at p. 352), that "[f]ederal courts have long recognized that the distinction between tort policy and social-legislation policy justifies departures from common law principles when claims arise that one is excluded as an independent contractor from a statute protecting 'employees' " (*ibid.*), and that "[a] number of state courts have agreed that in

26

worker's compensation cases, the employee-independent contractor issue cannot be decided absent consideration of the remedial statutory purpose." (*Id.* at pp. 352-353.) The court in *Borello* agreed with this focus on statutory purpose: "[U]nder the Act, the 'control-of-work-details' test for determining whether the person rendering service to another is an 'employee' or an excluded 'independent contractor' *must be applied with deference to the purposes of the protective legislation. The nature of the work, and the overall arrangement between the parties, must be examined to determine whether they come within the 'history and fundamental purposes' of the statute.*" (*Id.* at pp. 353-354, italics added.)

After identifying the various purposes of the workers' compensation act,[10] the court concluded: "The Act intends comprehensive coverage of injuries in employment. It accomplishes this goal by defining 'employment' broadly in terms of 'service to an employer' and by including a general presumption that any person 'in service to another' is a covered 'employee.' " (*Borello*, *supra*, 48 Cal.3d at p. 354.) At the same time, the court acknowledged that "[t]he express exclusion of 'independent contractors' [from the workers' compensation act (see Lab. Code, §§ 3353, 3357)] is purposeful . . . and has a limited but important function. It recognizes those situations where the Act's goals are best served by imposing the risk of 'no-fault' work injuries directly on the provider, rather than the recipient, of a compensated service. This is obviously the case, for example,

---

[10] The court stated in this regard that the workers' compensation act "seeks (1) to ensure that the cost of industrial injuries will be part of the cost of goods rather than a burden on society, (2) to guarantee prompt, limited compensation for an employee's work injuries, regardless of fault, as an inevitable cost of production, (3) to spur increased industrial safety, and (4) in return, to insulate the employer from tort liability for his employees' injuries. [Citations.]" (*Borello*, *supra*, 48 Cal.3d at p. 354.)

when the provider of service has the primary power over work safety, is best situated to distribute the risk and cost of injury as an expense of his own business, and has independently chosen the burdens and benefits of self-employment." (*Ibid.*)  The court concluded:  "This is the balance to be struck when deciding whether a worker is an employee or an independent contractor for purposes of the Act."  (*Ibid.*)

Although the *Borello* opinion emphasized that resolution of the employee or independent contractor question must properly proceed in a manner that accords deference to the history and fundamental purposes of the remedial statute in question (*Borello*, *supra*, 48 Cal.3d at pp. 353-354), the court at the same time made clear that it was *not* adopting "detailed new standards for examination of the issue."  (*Id.* at p. 354.)  The court explained in this regard that "the Restatement guidelines heretofore approved in our state remain a useful reference.  The standards set forth for contractor's licensees in [Labor Code] section 2750.5 . . . are also a helpful means of identifying the employee/contractor distinction.[11]

---

**11**      Section 2750.5, which addresses the employee or independent contractor question in the context of workers who perform services for which a contractor's license is required, provides:  "There is a rebuttable presumption affecting the burden of proof that a worker performing services for which a license is required pursuant to Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code, or who is performing such services for a person who is required to obtain such a license[,] is an employee rather than an independent contractor.  Proof of independent contractor status includes satisfactory proof of these factors:

"(a)  That the individual has the right to control and discretion as to the manner of performance of the contract for services in that the result of the work and not the means by which it is accomplished is the primary factor bargained for.

"(b)  That the individual is customarily engaged in an independently established business.

"(c)  That the individual's independent contractor status is bona fide and not a subterfuge to avoid employee status.  A bona fide independent contractor

*(footnote continued on next page)*

28

The relevant considerations may often overlap those pertinent under the common law. [Citation.] Each service arrangement must be evaluated on its facts, and the dispositive circumstances may vary from case to case." (*Borello*, *supra*, 48 Cal.3d at p. 354.)

The *Borello* court also took note of "the six-factor test developed by other jurisdictions which determine independent contractorship in light of the remedial purposes of the legislation." (*Borello*, *supra*, 48 Cal.3d at p. 354.)[12] The court

---

*(footnote continued from previous page)*

status is further evidenced by the presence of cumulative factors such as substantial investment other than personal services in the business, holding out to be in business for oneself, bargaining for a contract to complete a specific project for compensation by project rather than by time, control over the time and place the work is performed, supplying the tools or instrumentalities used in the work other than tools and instrumentalities normally and customarily provided by employees, hiring employees, performing work that is not ordinarily in the course of the principal's work, performing work that requires a particular skill, holding a license pursuant to the Business and Professions Code, the intent by the parties that the work relationship is of an independent contractor status, or that the relationship is not severable or terminable at will by the principal but gives rise to an action for breach of contract.

"In addition to the factors contained in subdivisions (a), (b), and (c), any person performing any function or activity for which a license is required pursuant to Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code shall hold a valid contractors' license as a condition of having independent contractor status.

"For purposes of workers' compensation law, this presumption is a supplement to the existing statutory definitions of employee and independent contractor, and is not intended to lessen the coverage of employees under Division 4 and Division 5."

[12]     In addition to the control of details factor, the other five factors included in the six-factor test are: "(1) the alleged employee's opportunity for profit or loss depending on his managerial skill; (2) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (3) whether the service rendered requires a special skill; (4) the degree of permanence of the working relationship; and (5) whether the service rendered is an

*(footnote continued on next page)*

29

observed the similarity of many of those guidelines to the ones identified in prior California decisions, and stated that "all [of those factors] are logically pertinent to the inherently difficult determination whether a provider of service is an employee or an excluded independent contractor for purposes of workers' compensation law." (*Borello*, *supra*, 48 Cal.3d at p. 355.)

In sum, the *Borello* court concluded that in determining whether a worker should properly be classified as a covered employee or an excluded independent contractor with deference to the purposes and intended reach of the remedial statute at issue, it is permissible to consider all of the various factors set forth in prior California cases, in Labor Code section 2750.5, and in the out-of-state cases adopting the six-factor test.

The *Borello* court then turned to the question whether, applying the appropriate legal analysis, the cucumber harvesters at issue in that case were properly considered employees or independent contractors. The court concluded that "[b]y any applicable test" the farmworkers were employees *as a matter of law*. (*Borello*, *supra*, 48 Cal.3d at p. 355; *id.* at p. 360.)

In reaching this conclusion, the court first rejected the grower's contention that the control of details factor weighed against a finding of employment because the grower had contracted with the workers only for a "specified result" and retained no interest or control over the details of the harvesters' actual work. (*Borello*, *supra*, 48 Cal.3d at p. 356.) In explaining its rejection, the court began by emphasizing that "Borello, whose business is the production and sale of agricultural crops, exercises 'pervasive control over the operation as a whole.'

*(footnote continued from previous page)*

integral part of the alleged employer's business." (*Borello*, *supra*, 48 Cal.3d at pp. 354-355.)

[Citation.]" (*Ibid.*)  The court observed in this regard: "Borello owns and cultivates the land for its own account.  Without any participation by the sharefarmers, Borello decides to grow cucumbers, obtains a sale price formula from the only available buyer, plants the crop, and cultivates it throughout most of its growing cycle.  The harvest takes place on Borello's premises, at a time determined by the crop's maturity.  During the harvest itself, Borello supplies the sorting bins and boxes, removes the harvest from the field, transports it to market, sells it, maintains documentation on the workers' proceeds, and hands out their checks.  Thus, '[a]ll meaningful aspects of this business relationship: price, crop cultivation, fertilization and insect prevention, payment, [and] right to deal with buyers . . . are controlled by [Borello].'  [Citation.]" (*Ibid.*, fns. omitted.)

Further, the court observed that "contrary to the growers' assertions, the cucumber harvest involves simple manual labor which can be performed in only one correct way.  Harvest and plant-care methods can be learned quickly.  While the work requires stamina and patience, it involves no peculiar skill beyond that expected of any employee.  [Citations.]  It is the simplicity of the work, not the harvesters' superior expertise, which makes detailed supervision and discipline unnecessary.  Diligence and quality control are achieved by the payment system, essentially a variation of the piecework formula familiar to agricultural employment." (*Borello*, *supra*, 48 Cal.3d at pp. 356-357.)

Thus, with respect to the control of details factor, the court concluded: "Under these circumstances, Borello retains all *necessary* control over the harvest portion of its operations.  A business entity may not avoid its statutory obligations by carving up its production process into minute steps, then asserting it lacks 'control' over the exact means by which one such step is performed by the responsible workers." (*Borello*, *supra*, 48 Cal.3d at p. 357.)

31

The *Borello* court then proceeded to discuss other factors that it found supported the classification of harvesters as employees. First, the court noted that "[t]he harvesters form a regular and integrated portion of Borello's business operation. Their work, though seasonal in nature, is 'permanent' in the agricultural process. Indeed, Richard Borello testified that he has a permanent relationship with the individual harvesters, in that many of the migrant families return year after year. This permanent integration of the workers into the heart of Borello's business is a strong indicator that Borello functions as an employer under the Act. [Citations.]" (*Borello*, *supra*, 48 Cal.3d at p. 357.)[13]

The court next found that "the sharefarmers and their families exhibit no characteristics which might place them outside the Act's intended coverage of employees. They engage in no distinct trade or calling. They do not hold themselves out in business. They perform typical farm labor for hire wherever jobs are available. They invest nothing but personal services and hand tools. They incur no opportunity for 'profit' or 'loss'; like employees hired on a piecework basis, they are simply paid by the size and grade of cucumbers they pick. They rely solely on work in the fields for their subsistence and livelihood. Despite the contract's admonitions, they have no practical opportunity to insure themselves or their families against loss of income caused by nontortious work injuries. If Borello is not their employer, they themselves, and society at large, thus assume the entire financial burden when such injuries occur. Without doubt,

---

[13]     In support of this point, the *Borello* court cited a passage from a leading national workers' compensation law treatise, stating: "The modern tendency is to find employment when the work being done is an integral part of the regular business of the employer, and when the worker, relative to the employer, does not furnish an independent business or professional service." (1C Larson, The Law of Workmen's Compensation (1986) § 45.00, p. 8-174.)

they are a class of workers to whom the protection of the Act is intended to extend." (*Borello*, *supra*, 48 Cal.3d at pp. 357-358, fns. omitted.)

Last, the *Borello* court rejected the growers' claim that the harvesters should be found to be independent contractors by virtue of their written agreement with the growers, which stated that they were not employees. The court explained: "[T]he protections conferred by the Act have a public purpose beyond the private interests of the workers themselves. Among other things, the statute represents society's recognition that if the financial risk of job injuries is not placed upon the businesses which produce them, it may fall upon the public treasury. . . . [¶] Moreover, there is no indication that Borello offers its cucumber harvesters any real choice of terms." (*Borello*, *supra*, 48 Cal.3d at pp. 358-359.)

On the basis of the foregoing reasons, the *Borello* court concluded that, as a matter of law, the farmworkers were employees for purposes of the workers' compensation act, and not independent contractors who were excluded from the coverage of the act. (*Borello*, *supra*, 48 Cal.3d at p. 360.)

As this lengthy review of the *Borello* decision demonstrates, although we have sometimes characterized *Borello* as embodying the common law test or standard for distinguishing employees and independent contractors (see, e.g., *Ayala*, *supra*, 59 Cal.4th at pp. 530-531), it appears more precise to describe *Borello* as calling for resolution of the employee or independent contractor question by focusing on the intended scope and purposes of the particular statutory provision or provisions at issue. In other words, *Borello* calls for application of a *statutory purpose* standard that considers the control of details and other potentially relevant factors identified in prior California and out-of-state cases in order to determine which classification (employee or independent contractor) best effectuates the underlying legislative intent and objective of the statutory scheme at issue.

33

The *Borello* decision repeatedly emphasizes statutory purpose as the touchstone for deciding whether a particular category of workers should be considered employees rather than independent contractors for purposes of social welfare legislation. (See *Borello*, *supra*, 48 Cal.3d at pp. 351, 353-354, 357, 358, 359.) This emphasis sets apart the *Borello* test for distinguishing employees from independent contractors from the standard embraced in more recent federal cases, which apply a more traditional common law test for distinguishing between employees and independent contractors for purposes of most federal statutes. Early federal cases interpreting a variety of New Deal social welfare enactments relied heavily on a statutory purpose interpretation in determining who should be considered an employee for purposes of those enactments. (See, e.g., *Labor Board v. Hearst Publications*, *supra*, 322 U.S. at pp. 124-129; *United States v. Silk* (1947) 331 U.S. 704, 711-714.) However, subsequent congressional legislation in reaction to such decisions has been interpreted to require that federal legislation generally be construed, in the absence of a more specific statutory standard or definition of employment, to embody a more traditional common law test for distinguishing between employees and independent contractors, in which the control of details factor is given considerable weight. (See, e.g., *Nationwide Mut. Ins. Co. v. Darden* (1992) 503 U.S. 318, 324-325 (*Darden*).) Unlike the federal experience, however, in the almost 30 years since the *Borello* decision, the California Legislature has not exhibited or registered any disagreement with either the statutory purpose standard adopted by the *Borello* decision or the application of that standard in *Borello* regarding the proper classification of the workers involved in that case. Instead, in response to the continuing serious problem of worker misclassification as independent contractors, the California Legislature has acted to impose substantial civil penalties on those that willfully misclassify, or

34

willfully aid in misclassifying, workers as independent contractors.  (See § 226.8, enacted by Stats. 2011, ch. 706, § 1; § 2753, enacted by Stats. 2011, ch. 706, § 2.)

## C. *Martinez*

We next summarize this court's decision in *Martinez*, *supra*, 49 Cal.4th 35. Although *Martinez* did not directly involve the issue of whether the workers in question were employees or independent contractors, it did address the meaning of the terms "employ" and "employer" as used in California wage orders, and the proper scope of the *Martinez* decision lies at the heart of the issue before our court in the present case.

In *Martinez*, *supra*, 49 Cal.4th 35, the strawberry grower Munoz & Sons (Munoz) directly employed seasonal agricultural workers but failed to pay the workers the required minimum or overtime wages they had earned.  Thereafter, the workers filed an action under section 1194 seeking to recover such wages not only from Munoz, but also from several produce merchants to whom Munoz regularly sold its strawberries.  The workers contended that in an action for unpaid minimum or overtime wages under section 1194, the alternative definitions of "employ" and "employer" set forth in the applicable Industrial Welfare Commission wage order — there, Wage Order No. 14 — constituted the applicable standards for determining who was a potentially liable employer.  They further contended that under the wage order definitions, the produce merchants, as well as Munoz, each should properly be considered the workers' employer who was jointly liable for the workers' unpaid wages.

In discussing this question, the court in *Martinez* recognized at the outset that the workers' attempt in that case to recover unpaid wages "from persons who contracted with their ostensible employer raises issues that have long avoided the attention of California's courts." (*Martinez*, *supra*, 49 Cal.4th at p. 50.)  The court

noted that although section 1194 derived from legislation enacted in 1913 as part of the act that created the Industrial Welfare Commission (hereafter IWC), this court had considered how employment should be defined in actions under section 1194 in only one earlier case. The court further observed that although the phrases used in the applicable IWC wage order to define "employ" and "employer" dated from 1916 and 1947, "the courts of this state have never considered their meaning or scope." (*Id.* at p. 50.)

In addressing these largely unexplored issues, the *Martinez* court turned initially to the language and legislative history of section 1194. The court noted that section 1194, by its terms, does not define the employment relationship or identify the entities who are liable under the statute for unpaid wages. After an extensive review of the statute's legislative history, however, the court concluded that "[a]n examination of section 1194 in its statutory and historical context shows unmistakably that the Legislature intended the IWC's wage orders to define the employment relationship in actions under the statute." (*Martinez*, *supra*, 49 Cal.4th at p. 52; see *id.* at pp. 53-57.)

The court in *Martinez* then considered how the IWC, utilizing its broad legislative authority (see Cal. Const., art. XIV, § 1; *Industrial Welf. Com.*, *supra*, 27 Cal.3d at p. 701), has defined the scope of the employment relationship through the provisions of its wage orders.[14]

---

[14] As explained in *Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1102, footnote 4: "The Industrial Welfare Commission (IWC) is the state agency empowered to formulate wage orders governing employment in California. [Citation.] The Legislature defunded the IWC in 2004, however its wage orders remain in effect. [Citation.]" The Legislature, of course, retains the authority to re-fund the IWC or to revise any provisions of the current wage orders through the enactment of new legislation.

36

The court first observed that, beginning in 1916, the IWC's wage orders encompassed, as employers, those entities who "employ or suffer or permit" persons to work for them. (*Martinez*, *supra*, 49 Cal.4th at p. 57, italics omitted.) The court noted that the "suffer or permit" language, now embodied in the definition of "employ" in the wage order at issue in *Martinez* (as well as in the transportation wage order at issue in this case and in all other wage orders), derived from statutes regulating and prohibiting child labor that were in use throughout the country in 1916, and which were based on model child labor laws published between 1904 and 1912. (*Id.* at pp. 57-58.) The *Martinez* court observed that the suffer or permit to work language had been interpreted to impose liability upon an entity "even when no common law employment relationship existed between the minor and the defendant, based on the defendant's failure to exercise reasonable care to prevent child labor from occurring." (*Id.* at p. 58.) The court explained: "Not requiring a common law master and servant relationship, the widely used 'employ, suffer or permit' standard reached irregular working arrangements the proprietor of a business might otherwise disavow with impunity. Courts applying such statutes before 1916 had imposed liability, for example, on a manufacturer for industrial injuries suffered by a boy hired by his father to oil machinery [citation], and on a mining company for injuries to a boy paid by coal miners to carry water [citation]." (*Ibid.*)

The *Martinez* court then went on to observe that, in addition to defining "employ" to mean suffer or permit to work, all IWC wage orders also include a separate provision defining "employer" to include a person or entity who "employs or exercises control over the wages, hours, or working conditions of any person." (*Martinez*, *supra*, 49 Cal.4th at p. 59.) With respect to this language, the court stated: "Beginning with the word 'employs,' the definition logically incorporates the separate definition of 'employ' (i.e., 'to engage, suffer, or permit

37

to work') as one alternative. The remainder of the definition — 'exercises control over . . . wages, hours, or working conditions" — has no clearly identified, precisely literal statutory or common law antecedent." (*Ibid*.) The court nonetheless made three observations about this language. First, the court noted that because the IWC's delegated authority has always been over wages, hours, and working conditions, it made sense to bring within the IWC's regulatory jurisdiction an entity that controls any one of these aspects of the employment relationship. (*Ibid.*) Second, the court explained that because this language, "phrased as it is in the alternative (i.e., 'wages, hours, *or* working conditions'), the language of the IWC's 'employer' definition has the obvious utility of reaching situations in which multiple entities control different aspects of the employment relationship, as when one entity, which hires and pays workers, places them with other entities that supervise the work." (*Ibid*.) Third, the court observed that "the IWC's 'employer' definition belongs to a set of revisions intended to distinguish state wage law from its federal analogue, the FLSA [Fair Labor Standards Act]" (*ibid.*), providing workers with greater protection than that afforded to workers under the FLSA as limited by Congress under the Portal-to-Portal Act of 1947. (*Id.* at pp. 59-60.)

Finally, the court in *Martinez* held that the IWC wage orders, by defining "employ" to mean "engage" to work (as well as to "suffer or permit" to work), incorporate the common law definition of employment as an alternative definition. The court explained in this regard: "The verbs 'to suffer' and 'to permit,' as we have seen, are terms of art in employment law. [Citation.] In contrast, the verb 'to engage' has no other apparent meaning in the present context than its plain, ordinary sense of 'to employ,' that is, to create a common law employment relationship. This conclusion makes sense because the IWC, even while extending its regulatory protection to workers whose employment status the common law did

38

not recognize, could not have intended to withhold protection from the regularly hired employees who undoubtedly comprise the vast majority of the state's workforce." (*Martinez*, *supra*, 49 Cal.4th at p. 64, fn. omitted.)

The *Martinez* court summarized its conclusion on this point as follows: "To employ, then, under the IWC's definition, has three alternative definitions. It means: (a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." (*Martinez*, *supra*, 49 Cal.4th at p. 64.)

Moreover, the court in *Martinez* thereafter took pains to emphasize the importance of *not* limiting the meaning and scope of "employment" to only the common law definition for purposes of the IWC's wage orders, declaring that "ignoring the rest of the IWC's broad regulatory definition would substantially impair the commission's authority and the effectiveness of its wage orders. The commission . . . has the power to adopt rules to make the minimum wage 'effective' by 'prevent[ing] evasion and subterfuge . . . .' [Citation.] . . . [L]anguage consistently used by the IWC to define the employment relationship, beginning with its first wage order in 1916 ('suffer, or permit'), was commonly understood to reach irregular working arrangements that fell outside the common law, having been drawn from statutes governing child labor and occasionally that of women. [Citation.] . . . To adopt such a definitional provision . . . lay squarely within the IWC's power, as the provision has 'a direct relation to minimum wages' [citation] and is reasonably necessary to effectuate the purposes of the statute [citations]. For a court to refuse to enforce such a provision in a presumptively valid wage order [citation] simply because it differs from the common law would thus endanger the commission's ability to achieve its statutory purposes. [¶] One cannot overstate the impact of such a holding on the IWC's powers. Were we to define employment exclusively according to the common law in civil actions for

39

unpaid wages we would render the commission's definitions effectively meaningless." (*Martinez*, *supra*, 49 Cal.4th at p. 65, fn. omitted.)

The court in *Martinez* thus concluded, first, that the definitions of the employment relationship contained in an applicable wage order apply in a civil action brought by a worker under section 1194, and, second, that the applicable wage order sets forth three alternative definitions of employment for purposes of the wage order: "(a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." (*Martinez*, *supra*, 49 Cal.4th at p. 64.) The court then went on to determine whether, under the wage order's alternative definitions, the produce merchants in that case should properly be considered the employer of the agricultural workers and thus could be held liable for the workers' unpaid minimum or overtime wages. (*Id.* at pp. 68-77.)

With respect to each of the produce merchants, the court in *Martinez* ultimately concluded that the merchants could not properly be found to be an employer under any of the wage order's alternative definitions.

First, in discussing the scope of the suffer or permit to work standard, the court stated generally: "We see no reason to refrain from giving the IWC's definition of 'employ' its historical meaning. That meaning was well established when the IWC first used the phrase 'suffer, or permit' to define employment, and no reason exists to believe the IWC intended another. Furthermore, the historical meaning continues to be highly relevant today: *A proprietor who knows that persons are working in his or her business without having been formally hired, or while being paid less than the minimum wage, clearly suffers or permits that work by failing to prevent it, while having the power to do so.*" (*Martinez*, *supra*, 49 Cal.4th at p. 69, italics added.) Nonetheless, the court rejected the workers' contention that because the merchants knew the agricultural workers were working

40

for Munoz and because their work benefitted the produce merchants, the merchants suffered or permitted the workers to work within the meaning of the wage order. The court explained that the fact the merchants may have benefitted from the workers' labor, "in the sense that any purchaser of commodities benefits," was not sufficient to incur liability for having suffered or permitted them to work. (*Id.* at p. 69.) The workers' claim failed because they were not working in the produce merchants' businesses and the merchants lacked the power or authority to prevent the workers from working for Munoz. (*Id.* at p. 70.)

Second, applying the standard that looks to the exercise of control over wages, hours or working conditions, the court rejected the argument that the produce merchants, through their contractual relationships with Munoz, dominated the Munoz business financially, and thus could properly be found to exercise indirect control over the wages and hours of Munoz's employees. (*Martinez, supra*, 49 Cal.4th at pp. 71-77.) The court found that contrary to the implicit premise of the workers' claim, the record indicated that the Munoz business was not a sham arrangement created by the produce merchants, but rather constituted "a single, integrated business operation, growing and harvesting strawberries for several unrelated merchants and combining revenue from all sources with a personal investment, in the hope of earning a profit at the end of the season." (*Id.* at p. 72.) Further, the court additionally determined that "Munoz alone, with the assistance of his foremen, hired and fired [the workers], trained and supervised them, determined their rate and manner of pay (hourly or piece rate), and set their hours, telling them when and where to report to work and when to take breaks." (*Ibid.*) Although the workers pointed to several occasions in which field representatives of the produce merchants had spoken to individual workers about the manner in which strawberries were to be packed (*id.* at pp. 74-77), the court concluded that the record did not indicate "the field representatives ever

41

supervised or exercised control over [Munoz's] employees" (*id.* at p. 76) or that the merchants had the right to exercise such control under their contracts with Munoz. (*Id.* at p. 77.)

With respect to the third alternative definition of an employment relationship, the common law standard, the *Martinez* court observed early in the decision that the workers disclaimed any argument that the produce merchants were their employers under common law. (*Martinez*, *supra*, 49 Cal.4th at p. 52, fn. 17.)

In sum, although the *Martinez* court concluded that the wage order definitions of the employment relationship apply in civil actions for unpaid minimum or overtime wages under section 1194, the court ultimately affirmed the trial court and Court of Appeal decisions in that case rejecting the workers' claims that the defendant produce merchants were the workers' employers for purposes of section 1194. (*Martinez*, *supra*, 49 Cal.4th at p. 78.)

### D. *Ayala*

Four years after the decision in *Martinez*, *supra*, 49 Cal.4th 35, we rendered the decision in *Ayala*, *supra*, 59 Cal.4th 522. In *Ayala*, a wage and hour action had been filed on behalf of newspaper carriers who had been hired by the Antelope Valley Press (Antelope Valley) to deliver its newspaper. The carriers alleged that Antelope Valley had misclassified them as independent contractors when they should have been treated as employees. The trial court in *Ayala* had denied the plaintiffs' motion to certify the action as a class action on the ground that under the *Borello* test — which, at the trial level, both parties agreed was the applicable standard — common issues did not predominate because application of the *Borello* standard "would require 'heavily individualized inquiries' into Antelope Valley's control over the carriers' work." (59 Cal.4th at p. 529.)

In reviewing the trial court's ruling in *Ayala*, this court noted that "[i]n deciding whether plaintiffs were employees or independent contractors, the trial court and Court of Appeal applied the common law test, discussed most recently at length in *Borello*, *supra*, 48 Cal.3d 341." (*Ayala*, *supra*, 59 Cal.4th at pp. 530-531.) We pointed out that while the *Ayala* case was pending in our court "[w]e solicited supplemental briefing concerning the possible relevance of the additional tests for employee status in IWC wage order No. 1-2001, subdivision 2(D)-(F)." (*Id.* at p. 531 [citing, inter alia, *Martinez*, *supra*, 49 Cal.4th 35].) The court in *Ayala* explained that "[i]n light of the supplemental briefing, and because plaintiffs proceeded below on the sole basis that they are employees under the common law, we now conclude we may resolve the case by applying the common law test for employment, without considering these other tests. [Citation.] Accordingly, we leave for another day the question of what application, if any, the wage order tests for employee status might have to wage and hour claims such as these, and confine ourselves to considering whether plaintiffs' theory that they are employees under the common law definition is one susceptible of proof on a classwide basis." (*Id.* at p. 531; see also *id.* at p. 532, fn. 3.)[15]

---

[15] In resolving the case under the *Borello* standard applied by the trial court, the court in *Ayala* concluded that the trial court had erred in failing to focus upon potential differences, if any, in Antelope Valley's *right to exercise control* over the carriers, rather than relying on variations in how that right *was actually exercised* by Antelope Valley, and the court remanded the case for reconsideration by the trial court under the correct legal standard. (*Ayala*, *supra*, 59 Cal.4th at pp. 532-540.) In the course of its discussion, the court in *Ayala* explained how the class action "predominance" requirement should generally be applied in this context, observing that under the *Borello* standard "[o]nce common and individual factors have been identified, the predominance inquiry calls for weighing costs and benefits. . . . [¶] . . . [T]hat weighing must be conducted with an eye to the reality that the considerations in the multifactor test are not of uniform significance. Some, such as the hirer's right to fire at will and the basic level of skill called for

*(footnote continued on next page)*

43

In the present case, we take up the issue we did not reach in *Ayala*, namely whether in a wage and hour class action alleging that the plaintiffs have been misclassified as independent contractors when they should have been classified as employees, a class may be certified based on the wage order definitions of "employ" and "employer" as construed in *Martinez*, *supra*, 49 Cal.4th 35, or, instead, whether the test for distinguishing between employees and independent contractors discussed in *Borello*, *supra*, 48 Cal.3d 341 is the only standard that applies in this setting.

### IV.  WITH RESPECT TO THE CLAIMS RESTING ON DYNAMEX'S ALLEGED FAILURE TO FULFILL OBLIGATIONS IMPOSED BY THE APPLICABLE WAGE ORDER, DID THE TRIAL COURT PROPERLY DETERMINE CLASS CERTIFICATION BASED ON THE DEFINITIONS OF "EMPLOY" AND "EMPLOYER" IN THE WAGE ORDER?

As noted, the drivers' general contention in this case is that Dynamex misclassified its drivers as independent contractors when they should have been classified as employees and as a result violated its obligations under the applicable wage order and a variety of statutes.  Most of the causes of action in the complaint rest on Dynamex's alleged failure to fulfill obligations directly set forth in the wage order — for example, the alleged failure to pay overtime wages or to provide accurate wage statements.  Other causes of action include Dynamex's alleged failure to comply with statutory obligations that do not derive directly from the

---

*(footnote continued from previous page)*

by the job, are often of inordinate importance.  [Citations.]  Others, such as the 'ownership of the instrumentalities and tools' of the job, may be of 'only evidential value,' relevant to support an inference that the hiree is, or is not, subject to the hirer's direction and control.  [Citation.]  Moreover, the significance of any one factor and its role in the overall calculus may vary from case to case depending on the nature of the work and the evidence.  (*Borello*, *supra*, 48 Cal.3d at p. 354.)"  (*Ayala*, *supra*, 59 Cal.4th at p. 539.)

applicable wage order — for example, the obligation to reimburse employees for business-related transportation expenses such as fuel or tolls. (See § 2802.) As already explained, Dynamex's petition for review challenged only the Court of Appeal's conclusion that the trial court, in ruling on the class certification motion, did not err in relying upon the definitions of the employment relationship contained in the wage order with regard to those claims that derive directly from the obligations imposed by the wage order. Accordingly, we address only that issue.[16]

As discussed above, in *Martinez*, *supra*, 49 Cal.4th 35, this court clearly held that the IWC has the authority, in promulgating its wage orders, to define the standard for determining when an entity is to be considered an employer for purposes of the applicable wage order. (*Id.* at pp. 60-62.) After examining the definitions of "employ" and "employer" set forth in the applicable wage order, the court in *Martinez* held that the wage order embodied three alternative definitions of "employ": "(a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." (*Id.* at p. 64.) The court in *Martinez* went on to consider each of these alternative definitions or standards in determining whether

---

[16] A trial court order denying a motion to decertify a class is generally subject to review pursuant to an abuse of discretion standard. (See, e.g., *Duran v. U.S. Bank Nat. Assn.* (2014) 59 Cal.4th 1, 49; *Sav-on Drug Stores, Inc. v . Superior Court* (2004) 34 Cal.4th 319, 326; *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435-436.) The question of what legal standard or test applies in determining whether a worker is an employee or, instead, an independent contractor for purposes of the obligations imposed by a wage order is, however, a question of law (cf., e.g., *Martinez*, *supra*, 49 Cal.4th at pp. 57-60 ), and if the trial court applied the wrong legal standard and that error affected the propriety of its class certification ruling, the order denying decertification would constitute an abuse of discretion. (See, e.g., *Duran v. U.S. Bank Nat. Assn., supra*, 59 Cal.4th at p. 49.)

the produce merchants in that case should properly be considered the employers of the agricultural workers for purposes of the applicable wage order. We ultimately concluded that the produce merchants were not employers of the workers under any of the wage order's definitions.

In the present case, Dynamex argues that two of the three alternative definitions identified in *Martinez* — the exercise control over wages hours or working conditions standard and the suffer or permit to work standard — are applicable only in determining whether an entity is a joint employer of the workers. In other words, Dynamex maintains that whether a business exercised control over the workers' wages, hours, or working conditions, or suffered or permitted the workers to work are relevant inquiries only in circumstances in which the question at issue is whether, when workers are "admitted employees" of one business (the primary employer), a business entity that has a relationship to the primary employer should also be considered an employer of the workers such that it is jointly responsible for the obligations imposed by the wage order. According to Dynamex, neither of these wage order definitions of "employ" and "employer" applies when the question to be answered is whether a worker is properly considered an employee who is covered by the wage order or, rather, an independent contractor who is excluded from the wage order's protections. The latter inquiry, Dynamex asserts, is governed solely by the third definition identified in *Martinez*, the *Borello* standard.

For the reasons discussed below, we conclude that there is no need in this case to determine whether the exercise control over wages, hours or working conditions definition is intended to apply outside the joint employer context, because we conclude that the suffer or permit to work standard properly applies to the question whether a worker should be considered an employee or, instead, an independent contractor, and that under the suffer or permit to work standard, the

46

trial court class certification order at issue here should be upheld. (See *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1032 [when plaintiffs in a class action rely on multiple legal theories, a trial court's certification of a class is not an abuse of discretion if certification is proper under any of the theories].) As explained below, the suffer or permit to work standard has a long and well-established history, and in other jurisdictions has regularly been held applicable to the question whether a worker should be considered an employee or an independent contractor for the purposes of social welfare legislation embodying that standard. Accordingly, we confine the discussion of Dynamex's argument to an analysis of the scope and meaning of the suffer or permit to work standard in California wage orders.

### A. Does the Suffer or Permit to Work Definition Apply to the Employee/Independent Contractor Distinction?

To begin with, although Dynamex contends that the suffer or permit to work standard should be understood as applicable only to the joint employer question like that involved in the *Martinez* decision itself, there is nothing in the language of the wage order indicating that the standard is so limited. As *Martinez* discussed, the suffer or permit language is one of the wage order's alternative definitions of the term "employ." (*Martinez*, *supra*, 49 Cal.4th at p. 64.) On its face, the standard would appear relevant to a determination whether, for purposes of the wage order, a worker should be considered an individual who is "employ[ed]" by an "employer" (and therefore an employee covered by the wage order) or, instead, an independent contractor who has been hired, but not "employed," by the hiring business (and thus not covered by the wage order).

Moreover, the discussion of the origin and history of the suffer or permit to work language in *Martinez* itself makes it quite clear that this standard was intended to apply beyond the joint employer context. As *Martinez* explains, at the

47

time the suffer or permit language was initially adopted as part of a wage order in 1916, such language "was already in use throughout the country in statutes regulating and prohibiting child labor (and occasionally that of women), having been recommended for that purpose in several model child labor laws published between 1904 and 1912 [citation]." (*Martinez*, *supra*, 49 Cal.4th at pp. 57-58, fn. omitted.) *Martinez* observed that "[n]ot requiring a common law master and servant relationship, the widely used 'employ, suffer or permit' standard reached irregular working arrangements the proprietor of a business might otherwise disavow with impunity. Courts applying such statutes before 1916 had imposed liability, for example, on a manufacturer for industrial injuries suffered by a boy hired by his father to oil machinery [citation], and on a mining company for injuries to a boy paid by coal miners to carry water [citation]." (*Id.* at p. 58.) Thus, *Martinez* demonstrates that the suffer or permit to work standard does not apply only to the joint employer context, but also can apply to the question whether, for purposes of the obligations imposed by a wage order, a worker who is not an "admitted employee" of a distinct primary employer should nonetheless be considered an employee of an entity that has "suffered or permitted" the worker to work in its business.[17]

---

[17] Although the suffer or permit to work standard is not limited to the joint employer context, there is no question that the standard was intended to cover a variety of entities that have a relationship with a worker's primary employer, for example, a larger business that contracts out some of its operations to a subcontractor but retains substantial control over the work. (See generally Goldstein et al., *Enforcing Fair Labor Standards in the Modern American Sweatshop: Rediscovering the Statutory Definition of Employment* (1999) 46 UCLA L.Rev. 983, 1055-1066 (*Enforcing Fair Labor Standards*).) It is important to understand, however, that even when a larger business is found to be a joint employer of the subcontractor's employees under the suffer or permit to work standard, this result does not mean that the larger business is prohibited from

*(footnote continued on next page)*

Dynamex contends, however, that even if the suffer or permit to work standard can apply outside the joint employer context to circumstances like those in the early child worker cases cited in *Martinez*, that standard should not be construed as applicable to the question whether an individual worker is an employee or, instead, an independent contractor. Dynamex proffers a number of arguments in support of this contention.

First, Dynamex points out that the suffer or permit to work language has been a part of California wage orders for over a century and that since the *Borello* decision was handed down in 1989, California decisions have applied the *Borello* standard in distinguishing employees from independent contractors in many contexts, including in cases arising under California's wage orders. (See, e.g., *Ali v. U.S.A. Cab Ltd.* (2009) 176 Cal.App.4th 1333, 1347; *Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1, 11-13 (*Estrada*).) Dynamex asserts that there is no reason to interpret the *Martinez* decision as altering this situation. In further support of this position, Dynamex refers to several sections of the Division of Labor Standards Enforcement (DLSE) Enforcement Policies and Interpretations Manual that discuss the employee/independent contractor distinction and that indicate that the DLSE has in the past applied the *Borello* standard in determining whether a worker is an employee or independent contractor for purposes of a wage order. (See DLSE, 2002 Update of the DLSE

---

*(footnote continued from previous page)*

entering into a relationship with the subcontractor or from obtaining benefits that may result from utilizing the services of a separate business entity. Even when the subcontractor's employees can hold the larger business responsible for violations of the wage order under the suffer or permit to work standard, the larger business, so long as authorized by contract, can seek reimbursement for any such liability from the subcontractor. (See *id.* at pp. 1144-1145.)

Enforcement Policies and Interpretations Manual (rev. 2017), §§ 2.2, 2.2.1, 28, available at <www.dir.ca.gov/dlse/DLSEManual/dlse_enfcmanual.pdf> [as of Apr. 30, 2018] (DLSE Manual).[18] Dynamex emphasizes that the relevant sections of the DLSE Manual dealing with independent contractors make no mention of the suffer or permit to work standard.

As our decision in *Martinez* itself observed, however, prior to *Martinez* no California decision had discussed the wage orders' suffer or permit to work language in any context. (*Martinez*, *supra*, 49 Cal.4th at p. 50.) In *Martinez*, we applied the suffer or permit to work standard in determining whether the produce merchants should be considered joint employers of the farmworkers even though that test had not been applied in prior California decisions. (*Id.* at pp. 69-71.) Thus, the lack of prior case support does not distinguish the employee/independent contractor context from the joint employer context at issue in *Martinez*.

With respect to the effect of the DLSE Manual, the parties and supporting amici curiae have not cited any DLSE decision since *Martinez* that has considered whether the suffer or permit to work standard should apply in resolving the employee/independent contractor question. Indeed, in a supplemental brief filed in response to a question posed by this court, the DLSE itself notes that the sections in the DLSE Manual that discuss independent contractors have not been revised since the decision in *Martinez*, and further states that "[t]he lack of any mention of *Martinez* in Chapter 28 of the Manual [the section directly discussing the employee/independent contractor distinction] . . . should not be interpreted as an expression of a view on the underlying question presented for review in this

---

[18] The DLSE is the administrative agency authorized to enforce California's labor laws, including applicable wage orders. (See, e.g., *Kilby v. CVS Pharmacy, Inc.* (2016) 63 Cal.4th 1, 13.)

case." Moreover, our past cases explain that because the DLSE Manual was not adopted pursuant to the procedures embodied in the California Administrative Procedure Act, its provisions are not entitled to the deference ordinarily accorded to formal administrative regulations, and that this court must independently determine the meaning and scope of the provisions of an applicable wage order. (See, e.g., *Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, 554-561; *Kilby v. CVS Pharmacy, Inc.*, *supra*, 63 Cal.4th at p. 13; *Peabody v. Time Warner Cable, Inc.* (2014) 59 Cal.4th 662, 669-670; *Martinez*, *supra*, 49 Cal.4th at p. 63, fn. 34; cf. *Tidewater v. Bradshaw* (1996) 14 Cal.4th 557, 569-570.) Accordingly, we conclude that Dynamex's reliance on the DLSE Manual is not persuasive.

Second, Dynamex asserts that the *Martinez* decision itself indicates that the *Borello* standard, rather than the suffer or permit to work standard, applies in the wage order context to distinguish independent contractors from employees. Dynamex points to a passage in *Martinez* in which the court relied on a number of factors discussed in *Borello* in concluding that Munoz, the grower who employed the individual agricultural workers, was an independent contractor rather than an employee of the produce merchants. (*Martinez*, *supra*, 49 Cal.4th at p. 73.) The grower in *Martinez*, however, operated a distinct business with its own employees and was not an individual worker like the delivery drivers at issue in the present case. In any event, the passage in question in *Martinez* makes it quite clear that the court was *not* deciding whether the *Borello* standard was the only applicable standard for determining whether a worker is an employee or independent contractor for purposes of an applicable wage order. (*Id.* at p. 73 ["Assuming the decision in *S.G. Borello*, *supra*, 48 Cal.3d 41, has any relevance to wage claims, *a point we do not decide*, the case does not advance plaintiffs' argument" (italics added)].)

51

Third, Dynamex maintains that a number of Court of Appeal opinions decided after *Martinez* demonstrate that the *Borello* standard continues to control the determination of whether a worker is an employee or independent contractor for purposes of an applicable wage order. (See, e.g., *Arnold v. Mutual of Omaha Ins. Co.* (2011) 202 Cal.App.4th 580, 586-588; *Arzate v. Bridge Terminal Transport, Inc.* (2011) 192 Cal.App.4th 419, 425-427.) None of the Court of Appeal decisions relied upon by Dynamex, however, refers to or analyzes the potential application of the suffer or permit to work standard to the employee or independent contractor question. By contrast, the Court of Appeal decision in the present case cited and discussed a number of post-*Martinez* Court of Appeal decisions recognizing that the definitions of "employ" and "employer" discussed in *Martinez* now govern the resolution of claims arising out of California wage orders, including whether a worker is an employee or independent contractor. (See, e.g., *Guerrero v. Superior Court* (2013) 213 Cal.App.4th 912, 945-952; *Bradley v. Networkers Internat. LLC* (2012) 211 Cal.App.4th 1129, 1146-1147; *Futrell v. Payday California, Inc.* (2010) 190 Cal.App.4th 1419, 1429.) In short, California decisions since *Martinez* do not support Dynamex's contention that the suffer or permit to work standard is not applicable to the employee/independent contractor determination.

Fourth, Dynamex contends that even if there is nothing in *Martinez* or subsequent Court of Appeal decisions that renders the suffer or permit to work standard inapplicable to the employee or independent contractor question, it would introduce unnecessary confusion into California law to adopt a standard for wage orders that differs from the *Borello* standard, which is widely utilized in other contexts for distinguishing between employees and independent contractors. The applicable wage order, however, purposefully adopts its own definition of "employ" to govern the application of the wage order's obligations that is

52

intentionally broader than the standard of employment that would otherwise apply, and as our decision in *Martinez* emphasized, we must respect the IWC's legislative authority to promulgate the test that will govern the scope of the wage order. (*Martinez*, *supra*, 49 Cal.4th at pp. 60-62.)

In its reply brief, Dynamex advances a variant of this contention, maintaining that a "two-test" approach to the employee or independent contractor distinction would invariably lead to inconsistent determinations for disparate claims under different labor statutes brought by the same individual. Any potential inconsistency, however, arises from the IWC's determination that it is appropriate to apply a distinct and particularly expansive definition of employment regarding obligations imposed by a wage order. Under *Martinez*, *supra*, 49 Cal.4th 35, the potential inconsistent results to which Dynamex objects could equally arise in the joint employer context: a third party that has a relationship to a worker's primary employer could be found to be a joint employer for purposes of the obligations imposed by a wage order, even when the third party may not constitute a joint employer for other purposes.

Moreover, because the *Borello* standard itself emphasizes the primacy of statutory purpose in resolving the employee or independent contractor question, when different statutory schemes have been enacted for different purposes, it is possible under *Borello* that a worker may properly be considered an employee with reference to one statute but not another. (Accord *People v. Superior Court* (*Sahlolbei*) (2017) 3 Cal.5th 230, 235-245.) Further, because the applicable federal wage and hour law — the Fair Labor Standards Act (FLSA) (29 U.S.C. § 201 et seq.) — contains its own standard for resolving the employee or independent contractor issue (see *post*, pp. 56-58, fn. 20, & pp. 61-62), an employer must, in any event, take into account a variety of applicable standards. Indeed, the federal context demonstrates that California is not alone is adopting a

53

distinct standard that provides broader coverage of workers with regard to the very fundamental protections afforded by wage and hour laws and wage orders; like California wage orders, the FLSA contains a broader standard of employment than that generally applicable in other, non-wage-and-hour federal contexts. (See, e.g., *Darden*, *supra*, 503 U.S. at p. 326.)

Finally, and perhaps most significantly, Dynamex argues that the suffer or permit to work standard cannot serve as the test for distinguishing employees from independent contractors because a literal application of that standard would characterize *all* individual workers who directly provide services to a business as employees. A business that hires any individual to provide services to it can always be said to knowingly "suffer or permit" such an individual to work for the business. A literal application of the suffer or permit to work standard, therefore, would bring within its reach even those individuals hired by a business — including unquestionably independent plumbers, electricians, architects, sole practitioner attorneys, and the like — who provide only occasional services unrelated to a company's primary line of business and who have traditionally been viewed as working in their own independent business. For this reason, Dynamex maintains that the *Borello* standard is the only approach that can provide a realistic and practical test for distinguishing employees from independent contractors.

It is true that, when applied literally and without consideration of its history and purposes in the context of California's wage orders, the suffer or permit to work language, standing alone, does not distinguish between, on the one hand, those individual workers who are properly considered employees for purposes of the wage order and, on the other hand, the type of traditional independent contractors described above, like independent plumbers and electricians, who could not reasonably have been intended by the wage order to be treated as employees of the hiring business. As other jurisdictions have recognized,

54

however, that the literal language of the suffer or permit to work standard does not itself resolve the question whether a worker is properly considered a covered employee rather than an excluded independent contractor does not mean that the suffer or permit to work standard has no substantial bearing on the determination whether an individual worker is properly considered an employee or independent contractor for purposes of a wage and hour statute or regulation. (See, e.g., *Rutherford Food Corp. v. McComb* (1947) 331 U.S. 722, 729 (*Rutherford Food*); *Scantland v. Jeffry Knight, Inc.* (11th Cir. 2013) 721 F.3d 1308, 1311 (*Scantland*); *Brock v. Superior Care, Inc.* (2d Cir. 1988) 840 F.2d 1054, 1058-1059 (*Superior Care*); *Sec'y of Labor, U.S. Dept. of Labor v. Lauritzen* (7th Cir. 1987) 835 F.2d 1529, 1535-1539 (*Lauritzen*); see *id.* at pp. 1539-1545 (conc. opn. of Easterbrook, J.); *Silent Woman, Ltd. v. Donovan* (E.D.Wis. 1984) 585 F.Supp. 447, 450-452 (*Silent Woman, Ltd.*); *Jeffcoat v. State Dept. of Labor* (Alaska 1987) 732 P.2d 1073, 1075-1078; *Cejas Commercial Interiors, Inc. v. Torres-Lizama* (Or.Ct.App. 2013) 316 P.3d 389, 397; *Commonwealth v. Stuber* (Pa. 2003) 822 A.2d 870, 873-875; *Anfinson v. FedEx Ground Package System* (Wn. 2012) 281 P.3d 289, 297-299; see generally U.S. Dept. of Labor, Wage & Hour Div., Administrator's Interpretation letter No. 2015-1, The Application of the Fair Labor Standard Act's "Suffer or Permit" Standard in the Identification of Employees Who Are Misclassified as Independent Contractors (July 15, 2015) available online at <http://www.blr.com/html_email/AI2015-1.pdf> [as of Apr. 30, 2018].)[19]

---

[19] The U.S. Department of Labor Wage and Hour Administrator's Interpretation No. 2015-1 was withdrawn by the Secretary of Labor on June 7, 2017. (See U.S. Dept. of Labor, News Release (Jun 7, 2017). <https://www.dol.gov/newsroom/releases/opa/opa20170607> [as of Apr. 30, 2018].) No new administrative guidance on this subject has been published to date.

As we explain, for a variety of reasons we agree with these authorities that the suffer or permit to work standard is relevant and significant in assessing the scope of the category of workers that the wage order was intended to protect. The standard is useful in determining who should properly be treated as covered employees, rather than excluded independent contractors, for purposes of the obligations imposed by the wage order.

At the outset, it is important to recognize that over the years and throughout the country, a number of standards or tests have been adopted in legislative enactments, administrative regulations, and court decisions as the means for distinguishing between those workers who should be considered employees and those who should be considered independent contractors.[20] The suffer or permit to work standard was proposed and adopted in 1937 as part of the FLSA, the

---

[20] The various standards are frequently described as falling within three broad categories. (See, e.g., Dubal, *Wage Slave or Entrepreneur?: Contesting the Dualism of Legal Worker Identities* (2017) 105 Cal.L.Rev. 65, 72.)

The first category is commonly characterized as embodying the common law standard, because the standards within this category give significant weight to evidence of the hirer's right to control the details of the work, which had its origin in the common law tort and respondeat superior context. These standards supplement the control of details factor with a variety of additional circumstances, often described as secondary factors. The United States Supreme Court's decision in *Darden*, *supra*, 503 U.S. 318, in holding that this standard applies in interpreting the meaning of the term "employee" in federal statutes that do not otherwise provide a meaningful definition of that term, lists 12 secondary factors to be considered in addition to the right to control factor. (503 U.S. at p. 323 [quoting *Community for Creative Non-Violence v. Reid* (1989) 490 U.S. 730, 751-752].) The IRS has adopted a variation of this standard which lists 20 secondary factors (IRS, Revenue Ruling 87-41, 1987-1 C. B. 296, 298-299); the state of Kansas also has adopted a variation which lists 20 secondary factors, some but not all of which are similar to those applied in other jurisdictions. (See, e.g., *Craig v. FedEx Ground Package Sys.* (Kan. 2014) 335 P.3d 66, 75-76.) Although this court's decision in *Borello* has sometimes been described as adopting the common law standard, as discussed above (*ante*, pp. 26-35), in *Borello* we explained that

*(footnote continued on next page)*

*(footnote continued from previous page)*

under California law the control factor is not as concerned with the hiring entity's control over the details of a worker's work as it is with determining whether the hiring entity has retained "*necessary* control" over the work, and *Borello* further made clear that consideration of all of the relevant factors is directed at determining whether treatment of the worker as an employee or an independent contractor would best effectuate the purpose of the statute at issue.  (*Borello*, *supra*, 48 Cal.3d at pp. 356-359.)

The second category is the "economic reality" (or "economic realities") standard that has been adopted in federal decisions as the standard applicable in cases arising under the FLSA .  (See, e.g., *Goldberg v. Whitaker House Co-op, Inc.* (1961) 366 U.S. 28, 33 (*Whitaker House Co-op*); *Tony & Susan Alamo Foundation v. Sec'y of Labor* (1985) 471 U.S. 290, 301 (*Alamo Foundation*).)  These cases interpret the "suffer or permit to work" definition of "employ" in the FLSA (29 U.S.C. § 203(g)) as intended to treat as employees those workers who, as a matter of economic reality, are economically dependent upon the hiring business, rather than realistically being in business for themselves.  In making this determination, lower federal court decisions generally refer to a list of factors, many that are considered under the common law standards, including "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business." (*Zheng v. Liberty Apparel Co.* (2d Cir. 2003) 355 F.3d 61, 67; *Superior Care, supra*, 840 F.2d at pp. 1058-1059; see generally Annot., Determination of "Independent Contractor" and "Employee" Status For Purposes of § 3(e)(1) of the Fair Labor Standards Act (29 U.S.C.A. § 203(e)(1)) (1981) 51 A.L.R.Fed. 702.)

The third category of standards is described as embodying the "ABC standard."  This standard, whose objective is to create a simpler, clearer test for determining whether the worker is an employee or an independent contractor, presumes a worker hired by an entity is an employee and places the burden on the hirer to establish that the worker is an independent contractor.  Under the ABC standard, the worker is an employee unless the hiring entity establishes *each* of three designated factors:  (a) that the worker is free from control and direction over performance of the work, both under the contract and in fact; (b) that the work provided is outside the usual course of the business for which the work is performed; *and* (c) that the worker is customarily engaged in an independently established trade, occupation or business (hence the ABC standard).  If the hirer fails to show that the worker satisfies each of the three criteria, the worker is

*(footnote continued on next page)*

principal federal wage and hour legislation.  One of the authors of the legislation, then-Senator (later United States Supreme Court Justice) Hugo L. Black, described this standard as "the broadest definition" that has been devised for extending the coverage of a statute or regulation to the widest class of workers that reasonably fall within the reach of a social welfare statute.  (See *United States v. Rosenwasser* (1945) 323 U.S. 360, 363, fn. 3 (*Rosenwasser*).)  More recent cases, in referring to the suffer or permit to work standard, continue to describe the standard in just such broad, inclusive terms.  (See, e.g., *Darden*, *supra*, 503 U.S. at p. 326 [noting the "striking breadth" of the suffer or permit to work standard]; *Zheng v. Liberty Apparel Co.*, *supra*, 355 F.3d at p. 69; *Lauritzen*, *supra*, 835 F.2d at p. 1543 (conc. opn. of Easterbrook, J.); *Donovan v. Dialamerica Marketing, Inc.* (3d Cir. 1985) 757 F.2d 1376, 1382.)

The adoption of the exceptionally broad suffer or permit to work standard in California wage orders finds its justification in the fundamental purposes and necessity of the minimum wage and maximum hour legislation in which the standard has traditionally been embodied.  Wage and hour statutes and wage orders were adopted in recognition of the fact that individual workers generally possess less bargaining power than a hiring business and that workers'

---

*(footnote continued from previous page)*

treated as an employee, not an independent contractor. (See generally Deknatel & Hoff-Downing, *ABC on the Books and in the Courts: An Analysis of Recent Independent Contractor and Misclassification Statutes* (2015) 18 U.Pa. J.L. & Soc. Change 53 (*ABC on the Books*).)
   In addition to these three categories, the recent Restatement of Employment Law, adopted by the American Law Institute in 2015, sets forth a standard which focuses, in addition to the control of details factor, on the entrepreneurial opportunity that the worker is afforded.  (See Rest., Employment, § 1.01, subds. (a), (b); see also *FedEx Home Delivery v. NLRB* (D.C. Cir. 2009) 563 F.3d 492, 497.)

fundamental need to earn income for their families' survival may lead them to accept work for substandard wages or working conditions. The basic objective of wage and hour legislation and wage orders is to ensure that such workers are provided at least the minimal wages and working conditions that are necessary to enable them to obtain a subsistence standard of living and to protect the workers' health and welfare. (See, e.g., *Rosenwasser*, *supra*, 323 U.S. at p. 361 [wage and hour laws are intended to protect workers against " 'the evils and dangers resulting from wages too low to buy the bare necessities of life and from long hours of work injurious to health' "]; *Industrial Welf .Com.*, *supra*, 27 Cal.3d at p. 700 [purpose of California wage orders is "to protect the health and welfare" of workers].) These critically important objectives support a very broad definition of the workers who fall within the reach of the wage orders.

These fundamental obligations of the IWC's wage orders are, of course, primarily for the benefit of the workers themselves, intended to enable them to provide at least minimally for themselves and their families and to accord them a modicum of dignity and self-respect. (See generally Rogers, *Justice at Work: Minimum Wage Laws and Social Equality* (2014) 92 Tex. L.Rev. 1543.) At the same time, California's *industry-wide* wage orders are also clearly intended for the benefit of those law-abiding businesses that comply with the obligations imposed by the wage orders, ensuring that such responsible companies are not hurt by unfair competition from competitor businesses that utilize substandard employment practices. (See § 90.5, subd. (a);[21] accord *Citicorp. Industrial Credit,*

---

[21] Section 90.5, subdivision (a) provides: "It is the policy of this state to vigorously enforce minimum labor standards in order to ensure employees are not required or permitted to work under substandard unlawful conditions or for employers that have not secured the payment of compensation, and to protect employers who comply with the law from those who attempt to gain a competitive

*(footnote continued on next page)*

*Inc. v. Brock* (1987) 483 U.S. 27, 36 ["While improving working conditions was undoubtedly *one* of Congress' concerns, it was certainly not the *only* aim of the FLSA. In addition to the goal [of establishing decent wages], the Act's declaration of policy . . . reflects Congress' desire to eliminate the competitive advantage enjoyed by goods produced under substandard conditions"]; *Roland Co. v. Walling* (1946) 326 U.S. 657, 669-670 ["[The FLSA] seeks to eliminate substandard labor conditions . . . on a wide scale throughout the nation. The purpose is to raise living standards. This purpose will fail of realization unless the Act has sufficiently broad coverage to eliminate in large measure . . . the competitive advantage accruing from savings in costs based upon substandard labor conditions. Otherwise the Act will be ineffective, and will penalize those who practice fair labor standards as against those who do not"].) Finally, the minimum employment standards imposed by wage orders are also for the benefit of the public at large, because if the wage orders' obligations are not fulfilled the public will often be left to assume responsibility for the ill effects to workers and their families resulting from substandard wages or unhealthy and unsafe working conditions.

Given the intended expansive reach of the suffer or permit to work standard as reflected by its history, along with the more general principle that wage orders are the type of remedial legislation that must be liberally construed in a manner that serves its remedial purposes (see, e.g., *Industrial Welf. Com.*, *supra*, 27 Cal.3d at p. 702), as our decision in *Martinez* recognized, the suffer or permit to work standard must be interpreted and applied broadly to include within the covered

*(footnote continued from previous page)*

advantage at the expense of their workers by failing to comply with minimum labor standards."

60

"employee" category *all* individual workers who can reasonably be viewed as *"working in the [hiring entity's] business."* (*Martinez, supra*, 49 Cal.4th at p. 69, italics added ["A proprietor who knows that persons are *working in his or her business* without having been formally hired, or while being paid less than the minimum wage, clearly suffers or permits that work by failing to prevent it, while having the power to do so" (italics added)].) Under the suffer or permit to work standard, an individual worker who has been hired by a company can properly be viewed as the type of independent contractor to which the wage order was not intended to apply only if the worker is the type of traditional independent contractor — such as an independent plumber or electrician — who would *not* reasonably have been viewed as working *in the hiring business*. Such an individual would have been realistically understood, instead, as *working only in his or her own independent business*. (See, e.g., *Allen v. Hayward* (Q.B. 1845) 115 Eng.Rep. 749, 755 [describing independent contractor as "a person carrying on an independent business . . . to perform works which [the hiring local officials] could not execute for themselves, and who was known to all the world as performing them"]; *Enforcing Fair Labor Standards*, *supra*, 46 UCLA L.Rev. at pp. 1143-1144.)

The federal courts, in applying the suffer or permit to work standard set forth in the FLSA, have recognized that the standard was intended to be broader and more inclusive than the preexisting common law test for distinguishing employees from independent contractors, but at the same time, does not purport to render every individual worker an employee rather than an independent contractor. (See *Rutherford Food*, *supra*, 331 U.S. 722, 728-729.) As noted above (*ante*, pp. 56-58, fn. 20), the federal courts have developed what is generally described as the "economic reality" test for determining whether a worker should be considered an employee or independent contractor for purposes of the FLSA — namely,

61

whether, as a matter of economic reality, the worker is economically dependent upon and makes a living in another's business (in which case he or she is considered to be a covered employee) or, instead is in business for himself or herself (and may properly be considered an excluded independent contractor). (See, e.g., *Whitaker House Co-op*, *supra*, 366 U.S. 28, 33; *Alamo Foundation*, *supra*, 471 U.S. 290, 301.)  In applying the economic reality test, federal courts have looked to a list of factors that is briefer than, but somewhat comparable to, the list of factors considered in the pre-*Borello* California decisions and in *Borello* itself.  (See, e.g., *Superior Care*, *supra*, 840 F.2d at p. 1059; *Lauritzen*, *supra*, 835 F.2d at pp. 1534-1535.)  Furthermore, like *Borello*, federal FLSA decisions applying the economic reality standard have held that no one factor is determinative and that the ultimate decision whether a worker is to be found to be an employee or independent contractor for purposes of the FLSA should be based on all the circumstances.  (*Rutherford Food*, *supra*, 331 U.S. at p. 730; *Scantland*, *supra*, 721 F.3d at pp. 1312-1313; *Real v. Driscoll Strawberry Associates, Inc.* (1979) 603 F.3d 748, 754-755; see generally Annot., *supra*, 51 A.L.R.Fed. 702.)

A multifactor standard — like the economic reality standard or the *Borello* standard — that calls for consideration of all potentially relevant factual distinctions in different employment arrangements on a case-by-case, totality-of-the-circumstances basis has its advantages.  A number of state courts, administrative agencies and academic commentators have observed, however, that such a wide-ranging and flexible test for evaluating whether a worker should be considered an employee or an independent contractor has significant disadvantages, particularly when applied in the wage and hour context.

First, these jurisdictions and commentators have pointed out that a multifactor, "all the circumstances" standard makes it difficult for both hiring businesses and workers to determine in advance how a particular category of

workers will be classified, frequently leaving the ultimate employee or independent contractor determination to a subsequent and often considerably delayed judicial decision.  In practice, the lack of an easily and consistently applied standard often leaves both businesses and workers in the dark with respect to basic questions relating to wages and working conditions that arise regularly, on a day-to-day basis.  (See, e.g., *Hargrove v. Sleepy's*, *LLC* (N.J. 2015) 106 A.3d 449, 465 (*Hargrove*) ["permitting an employee to know when, how, and how much he will be paid requires a test designed to yield a more predictable result than a totality-of-the-circumstances analysis that is by its nature case specific"]; accord *Lauritzen*, *supra*, 835 F.2d at p. 1539 (conc. opn. of Easterbrook, J.) ["People are entitled to know the legal rules before they act, and only the most compelling reason should lead a court to announce an approach under which no one can know where he stands until litigation has been completed. . . .  My colleagues' balancing approach is the prevailing method, which they apply carefully.  But it is unsatisfactory both because it offers little guidance for future cases and because any balancing test begs questions about which aspects of 'economic reality' matter, and why"].)

Second, commentators have also pointed out that the use of a multifactor, all the circumstances standard affords a hiring business greater opportunity to evade its fundamental responsibilities under a wage and hour law by dividing its work force into disparate categories and varying the working conditions of individual workers within such categories with an eye to the many circumstances that may be relevant under the multifactor standard.  (See, e.g., Middleton, *Contingent Workers in a Changing Economy: Endure, Adapt, or Organize?* (1997) 22 N.Y.U. Rev. L. & Soc. Change 557, 568-569 ["[t]he legal test for determining employee/independent contractor status is a complex and manipulable multifactor test which invites employers to structure their relationships with employees in

whatever manner best evades liability"]; Befort, *Labor and Employment Law at the Millennium: A Historical Review and Critical Assessment* (2002) 43 B.C. L.Rev. 351, 419; Carlson, *Why the Law Still Can't Tell an Employee When It Sees One and How It Ought to Stop Trying* (2001) 22 Berkeley J. Emp. & Lab. L. 295, 335-338.)[22]

As already noted (*ante*, pp. 56-58, fn. 20), a number of jurisdictions have adopted a simpler, more structured test for distinguishing between employees and independent contractors — the so-called "ABC" test — that minimizes these disadvantages.  The ABC test presumptively considers all workers to be employees, and permits workers to be classified as independent contractors only if the hiring business demonstrates that the worker in question satisfies *each* of three conditions:  (a) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (b) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (c) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.[23]

---

[22]    Some jurists and commentators have advanced broader criticisms of the "economic reality" standard as applied by federal decisions, suggesting that the various factors are not readily susceptible to consistent application and that the standard — originally formulated in decisions dealing with other New Deal labor statutes (see *Martinez*, *supra*, 49 Cal.4th at pp. 66-67) — is not as expansive as the suffer or permit to work standard was intended to be.  (See, e.g., *Lauritzen*, *supra*, 835 F.2d at pp. 1539-1545 (conc. opn. of Easterbrook, J.); *Enforcing Fair Labor Standards*, *supra*, 46 UCLA L.Rev. at pp. 1115-1123.)

[23]    The wording of the ABC test varies in some respects from jurisdiction to jurisdiction.  (See *ABC on the Books*, *supra*, 18 U.Pa. J.L. & Soc. Change, at pp. 67-71.)  The version we have set forth in text (and which we adopt hereafter (*post,* pp. 66-77)) tracks the Massachusetts version of the ABC test.  (See Mass.G.L., ch. 149, § 148B; see also Del.Code Ann., tit. 19, §§ 3501(a)(7),

*(footnote continued on next page)*

Unlike a number of our sister states that included the suffer-or-permit-to-work standard in their wage and hour laws or regulations *after* the FLSA had been enacted and had been interpreted to incorporate the economic reality test, California's adoption of the suffer or permit to work standard predated the enactment of the FLSA.  (See *Martinez*, *supra*, 40 Cal.4th at pp. 57-59.)  Thus, as a matter of legislative intent, the IWC's adoption of the suffer or permit to work standard in California wage orders was not intended to embrace the federal economic reality test.  Furthermore, prior California cases have declined to interpret California wage orders as governed by the federal economic reality standard and instead have indicated that the California wage orders are intended to provide broader protection than that accorded workers under the federal standard.  (See *Martinez*, *supra*, 49 Cal.4th at pp. 66-68; accord *Mendiola v. CPS Security Solutions, Inc.* (2015) 60 Cal.4th 833,

---

*(footnote continued from previous page)*

3503(c).)  Unlike some other versions, which provide that a hiring entity may satisfy part B by establishing *either* (1) that the work provided is outside the usual course of the business for which the work is performed, *or* (2) that the work performed is outside all the places of business of the hiring entity (see, e.g., N.J. Stat. Ann. § 43:21-19(i)(6)(A-C)), the Massachusetts version permits the hiring entity to satisfy part B only if it establishes that the work is outside the usual course of the business of the hiring entity.  In light of contemporary work practices, in which many employees telecommute or work from their homes, we conclude the Massachusetts version of part B provides the alternative that is more consistent with the intended broad reach of the suffer or permit to work definition in California wage orders.

Many jurisdictions that have adopted the ABC test use the standard only in the unemployment insurance context, but other jurisdictions use the ABC test more generally in determining the employee or independent contractor question with respect to a variety of employee-protective labor statutes.  (See, e.g., Mass.G.L. ch. 149, §148B; Del. Code Ann., tit. 19, §§ 3501(a)(7), 3503(c); *Hargrove*, *supra*, 106 A.3d at pp. 462-465; see generally *ABC on the Books*, *supra*, 18 U.Pa. J.L. & Soc. Change, at pp. 65-72 [discussing numerous state statutes and judicial decisions].)

843; *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 592; *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 797-798.)

We find merit in the concerns noted above regarding the disadvantages, particularly in the wage and hour context, inherent in relying upon a multifactor, all the circumstances standard for distinguishing between employees and independent contractors. As a consequence, we conclude it is appropriate, and most consistent with the history and purpose of the suffer or permit to work standard in California's wage orders, to interpret that standard as: (1) placing the burden on the hiring entity to establish that the worker is an independent contractor who was not intended to be included within the wage order's coverage;[24] and (2) requiring the hiring entity, in order to meet this burden, to establish *each* of the three factors embodied in the ABC test — namely (A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (B) that the worker performs work that is outside the

---

[24]    Even in the workers' compensation context in which the applicable California statutes contain a definition of "employee" that is less expansive than that provided by the suffer or permit to work standard (see §§ 3351, 3353), the accompanying statutes establish that "[a hiring business] seeking to avoid liability has the burden of proving that persons whose services [the business] has retained are independent contractors rather than employees." (*Borello*, *supra*, 48 Cal.3d at p. 349, citing §§ 3357, 5705, subd. (a).)  Moreover, the rule that a hiring entity has the burden of establishing that a worker is an independent contractor rather than an employee has long been applied in California decisions outside the workers' compensation context. (See, e.g., *Robinson v. George* (1940) 16 Cal.2d 238, 242; *Linton v. DeSoto Cab Co., Inc.* (2017) 15 Cal.App.5th 1208, 1220-1221.)  Accordingly, the expansive suffer or permit to work standard is reasonably interpreted as placing the burden on a hiring business to prove that a worker the business has retained is not an employee who is covered by an applicable wage order but rather an independent contractor to whom the wage order was not intended to apply.

usual course of the hiring entity's business; *and* (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed.  (Accord *Hargrove*, *supra*, 106 A.3d at pp. 463-464[25]; see also Weil, The Fissured Workplace (2014) pp. 204-205 [recommending adoption of the ABC test]; *ABC on the Books*, *supra*, 18 U.Pa. J.L. & Soc. Change at pp. 61, 82-84, 101-102[26].)

---

[25]     In *Hargrove*, *supra*, 106 A.3d 449, the New Jersey Supreme Court was faced with the question of the proper standard to be applied in determining whether a worker should be considered a covered employee or an excluded independent contractor for purposes of two distinct New Jersey labor statutes, the New Jersey Wage Payment Law and the New Jersey Wage and Hour Law.  Both statutes defined the term "employ" or "employee" to include "to suffer or to permit to work" (see N.J. Stat. Ann. § 34:11-4.1(b); N.J. Stat. Ann. § 34:11-56a1(f)), and the New Jersey Department of Labor, in applying the Wage and Hour Law, had utilized the ABC standard — a standard incorporated in the New Jersey Unemployment Compensation Act (N.J. Stat. Ann. § 43:21-19(i)(6)(A)-(C)) — in determining whether a worker was an employee or independent contractor for purposes of the Wage and Hour Law.  (See N.J. Adm. Code § 12:56-16.1.)  In *Hargrove*, the New Jersey Supreme Court concluded that "any employment-status dispute arising under [either the New Jersey Wage Payment Law or the New Jersey Wage and Hour Law] should be resolved by utilizing the 'ABC' test . . . ."  (106 A.3d at p. 463.)

In reaching this conclusion, the court in *Hargrove* recognized that both of the New Jersey statutes in question "use the term 'suffer or permit' to define those who are within the protection of each statute" and that such language had been interpreted in federal decisions to support the "economic reality" standard.  (*Hargrove*, *supra*, 106 A.3d at p. 463.)  Nonetheless, the court in *Hargrove*, in finding that application of the ABC test was appropriate, relied in part on the fact that "the 'ABC' test operates to provide more predictability and may cast a wider net than the FLSA 'economic realities' standard" and that "[by] requiring each identified factor to be satisfied to permit classification as an independent contractor, the 'ABC' test fosters the provision of greater income security for workers, which is the express purpose of both [statutes]."  (*Hargrove*, *supra*, 106 A.3d at p. 464.)

[26]     The recent *ABC on the Books* article, which comprehensively reviews recent legislative measures and judicial decisions on this subject, concludes that

*(footnote continued on next page)*

We briefly discuss each part of the ABC test and its relationship to the suffer or permit to work definition.

1. *Part A:  Is the worker free from the control and direction of the hiring entity in the performance of the work, both under the contract for the performance of the work and in fact?*

First, as our decision in *Martinez* makes clear (*Martinez*, *supra*, 49 Cal.3d at p. 58), the suffer or permit to work definition was intended to be broader and more inclusive than the common law test, under which a worker's freedom from the control of the hiring entity in the performance of the work, both under the contract for the performance of the work and in fact, was the principal factor in establishing that a worker was an independent contractor rather than an employee. Accordingly, because a worker who is subject, either as a matter of contractual right or in actual practice, to the type and degree of control a business typically exercises over employees would be considered an employee under the common law test, such a worker would, a fortiori, also properly be treated as an employee for purposes of the suffer or permit to work standard. Further, as under *Borello*, *supra*, 48 Cal.3d at pages 353-354, 356-357, depending on the nature of the work and overall arrangement between the parties, a business need not control the precise manner or details of the work in order to be found to have maintained the necessary control that an employer ordinarily possesses over its employees, but

---

*(footnote continued from previous page)*

"case law suggests that thus far, the ABC test allows courts to look beyond labels and evaluate whether workers are truly engaged in a separate business or whether the business is being used by the employer to evade wage, tax, and other obligations." (*ABC on the Books*, *supra*, 18 U.Pa. J.L. & Soc. Change at p. 84.)

does not possess over a genuine independent contractor.  The hiring entity must establish that the worker is free of such control to satisfy part A of the test.[27]

## 2. *Part B:  Does the worker perform work that is outside the usual course of the hiring entity's business?*

Second, independent of the question of control, the child labor antecedents of the suffer or permit to work language demonstrate that one principal objective of the suffer or permit to work standard is to bring within the "employee" category

---

[27] In *Fleece on Earth v. Dep't of Emple. & Training* (Vt. 2007) 923 A.2d 594, the Vermont Supreme Court held that the plaintiff children's wear company that designed all the clothing sold by the company and provided all the patterns and yarn for work-at-home knitters and sewers who made the clothing had failed to establish that the workers were sufficiently free of the company's control to satisfy part A of the ABC test, even though the knitters and sewers worked at home on their own machines at their own pace and on the days and at the times of their own choosing.  Noting that the labor statute at issue "seeks to protect workers and envisions employment broadly," the court reasoned that "[t]he degree of control and direction over the production of a retailer's product is no different when the sweater is knitted at home at midnight than if it were produced between nine and five in a factory.  That the product is knit, not crocheted, and how it is to be knit, is dictated by the pattern provided by [the company].  To reduce part A of the ABC test to a matter of what time of day and in whose chair the knitter sits when the product is produced ignores the protective purpose of the [applicable] law." (923 A.2d at pp. 599-600.)  (See, e.g., *Western Ports v. Employment Sec. Dept.* (Wn.Ct.App. 2002) 41 P.3d 510, 517-520 [hiring entity failed to establish that truck driver was free from its control within the meaning of part A of the ABC test, where hiring entity required driver to keep truck clean, to obtain the company's permission before transporting passengers, to go to the company's dispatch center to obtain assignments not scheduled in advance, and could terminate driver's services for tardiness, failure to contact the dispatch unit, or any violation of the company's written policy]; cf., e.g., *Great N. Constr., Inc. v. Dept. of Labor* (Vt. 2016) 161 A.3d 1207, 1215 [construction company established that worker who specialized in historic reconstruction was sufficiently free of the company's control to satisfy part A of the ABC test, where worker set his own schedule, worked without supervision, purchased all materials he used on his own business credit card, and had declined an offer of employment proffered by the company because he wanted control over his own activities].)

*all* individuals who can reasonably be viewed as working "*in the [hiring entity's] business*" (see *Martinez*, *supra*, 49 Cal.4th at p. 69, italics added), that is, all individuals who are reasonably viewed as providing services to the business in a role comparable to that of an employee, rather than in a role comparable to that of a traditional independent contractor.  (Accord *Rutherford Food*, *supra*, 331 U.S. at p. 729 [under FLSA, label put on relationship by hiring business is not controlling and inquiry instead focuses on whether "the work done, in essence, follows the usual path of an employee'].)  Workers whose roles are most clearly comparable to those of employees include individuals whose services are provided within the usual course of the business of the entity for which the work is performed and thus who would ordinarily be viewed by others as working in the hiring entity's business and not as working, instead, in the worker's own independent business.

Thus, on the one hand, when a retail store hires an outside plumber to repair a leak in a bathroom on its premises or hires an outside electrician to install a new electrical line, the services of the plumber or electrician are not part of the store's usual course of business and the store would not reasonably be seen as having suffered or permitted the plumber or electrician to provide services to it as an employee.  (See, e.g., *Enforcing Fair Labor Standards*, *supra*, 46 UCLA L.Rev. at p. 1159.)  On the other hand, when a clothing manufacturing company hires work-at-home seamstresses to make dresses from cloth and patterns supplied by the company that will thereafter be sold by the company (cf., e.g., *Silent Woman, Ltd.*, *supra*, 585 F.Supp. at pp. 450-452; accord *Whitaker House Co-op*, *supra*, 366 U.S. 28), or when a bakery hires cake decorators to work on a regular basis on its custom-designed cakes (cf., e.g,, *Dole v. Snell* (10th Cir. 1989) 875 F.2d 802, 811), the workers are part of the hiring entity's usual business operation and the hiring business can reasonably be viewed as having suffered or permitted the workers to provide services as employees.  In the latter settings, the workers' role

70

within the hiring entity's usual business operations is more like that of an employee than that of an independent contractor.

Treating all workers whose services are provided within the usual course of the hiring entity's business as employees is important to ensure that those workers who need and want the fundamental protections afforded by the wage order do not lose those protections. If the wage order's obligations could be avoided for workers who provide services in a role comparable to employees but who are willing to forgo the wage order's protections, other workers who provide similar services and are intended to be protected under the suffer or permit to work standard would frequently find themselves displaced by those willing to decline such coverage. As the United States Supreme Court explained in a somewhat analogous context in *Alamo Foundation*, *supra*, 471 U.S. at page 302, with respect to the federal wage and hour law: "[T]he purposes of the [FLSA] require that it be applied even to those who would decline its protections. If an exception to the Act were carved out for employees willing to testify that they performed work 'voluntarily,' employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act. [Citations.] Such exceptions to coverage would affect many more people than those workers directly at issue in this case and would be likely to exert a general downward pressure on wages in competing businesses." (*Ibid.*)

As the quoted passage from the *Alamo Foundation* case suggests, a focus on the nature of the workers' role within a hiring entity's usual business operation also aligns with the additional purpose of wage orders to protect companies that in good faith comply with a wage order's obligations against those competitors in the same industry or line of business that resort to cost saving worker classifications that fail to provide the required minimum protections to similarly situated workers. A wage order's *industry-wide* minimum requirements are intended to create a

71

level playing field among competing businesses in the same industry in order to prevent the type of "race to the bottom" that occurs when businesses implement new structures or policies that result in substandard wages and unhealthy conditions for workers. (Accord *Gemsco, Inc. v. Walling* (1945) 324 U.S. 244, 252 ["[I]f the [proposed restrictions on homeworkers] cannot be made, the floor for the entire industry falls and the right of the homeworkers and the employers to be free from the prohibition destroys the right of the much larger number of factory workers to receive the minimum wage"]; see generally *Enforcing Fair Labor Standards*, *supra*, 46 UCLA. L.Rev. at pp. 1178-1103.) Competing businesses that hire workers who perform the same or comparable duties within the entities' usual business operations should be treated similarly for purposes of the wage order.[28]

Accordingly, a hiring entity must establish that the worker performs work that is outside the usual course of its business in order to satisfy part B of the ABC test.[29]

---

[28]    If a business concludes that there are economic or noneconomic advantages other than avoiding the obligations imposed by the wage order to be obtained by according greater freedom of action to its workers, the business is, of course, free to adopt those conditions while still treating the workers as employees for purposes of the applicable wage order. Thus, for example, if a business concludes that it improves the morale and/or productivity of a category of workers to afford them the freedom to set their own hours or to accept or decline a particular assignment, the business may do so while still treating the workers as employees for purposes of the wage order.

[29]    In *McPherson Timberlands v. Unemployment Ins. Comm'n* (Me. 1998) 714 A.2d 818, the Maine Supreme Court held that the cutting and harvesting of timber by an individual worker was work performed in the usual course of business of the plaintiff timber management company whose business operation involved contracting for the purchase and harvesting of trees and the sale and delivery of the cut timber to customers. Rejecting the company's contention that the timber

*(footnote continued on next page)*

3. *Part C: Is the worker customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity?*

Third, as the situations that gave rise to the suffer or permit to work language disclose, the suffer or permit to work standard, by expansively defining who is an employer, is intended to preclude a business from evading the prohibitions or responsibilities embodied in the relevant wage orders directly or indirectly — through indifference, negligence, intentional subterfuge, or misclassification. It is well established, under all of the varied standards that have been utilized for distinguishing employees and independent contractors, that a business cannot unilaterally determine a worker's status simply by assigning the worker the label "independent contractor" or by requiring the worker, as a

---

*(footnote continued from previous page)*

harvesting work was outside its usual course of business because the company did not currently own any timber harvesting equipment itself, the court upheld an administrative ruling that the harvesting work was "not 'merely incidental' to [the company's] business, but rather was an 'integral part of' that business." (714 A.2d at p. 821.) By contrast, in *Great N. Constr., Inc. v. Dept. of Labor*, *supra*, 161 A.3d at page 1215, the Vermont Supreme Court held the hiring entity, a general construction company, had established that the specialized historic restoration work performed by the worker in question was outside the usual course of the company's business within the meaning of part B, where the work involved the use of specialized equipment and special expertise that the company did not possess and did not need for its usual general commercial and residential work. (See also, e.g., *Appeal of Niadni, Inc.* (2014) 166 N.H. 256 [performance of live entertainers within usual course of business of plaintiff resort which advertised and regularly provided entertainment]; *Mattatuck Museum-Mattatuck Historical Soc'y v. Administrator, Unemployment Compensation Act* (Conn. 1996) 679 A.2d 347, 351-352 [art instructor who taught art classes at museum performed work within the usual course of the museum's business, where museum offered art classes on a regular and continuous basis, produced brochures announcing the art courses, class hours, registration fees and instructor's names, and discounted the cost of the classes for museum members].)

condition of hiring, to enter into a contract that designates the worker an independent contractor.  (See, e.g., *Borello*, *supra*, 48 Cal.3d at pp. 349, 358-359; *Rutherford Food*, *supra*, 331 U.S. at p. 729.)  This restriction on a hiring business's unilateral authority has particular force and effect under the wage orders' broad suffer or permit to work standard.

As a matter of common usage, the term "independent contractor," when applied to an individual worker, ordinarily has been understood to refer to an individual who *independently* has made the decision to go into business for himself or herself.  (See, e.g., *Borello*, *supra*, 48 Cal.3d at p. 354 [describing independent contractor as a worker who "has independently chosen the burdens and benefits of self-employment"].)  Such an individual generally takes the usual steps to establish and promote his or her independent business — for example, through incorporation, licensure, advertisements, routine offerings to provide the services of the independent business to the public or to a number of potential customers, and the like.  When a worker has not independently decided to engage in an independently established business but instead is simply designated an independent contractor by the unilateral action of a hiring entity, there is a substantial risk that the hiring business is attempting to evade the demands of an applicable wage order through misclassification.  A company that labels as independent contractors a class of workers who are not engaged in an independently established business in order to enable the company to obtain the economic advantages that flow from avoiding the financial obligations that a wage order imposes on employers unquestionably violates the fundamental purposes of the wage order.  The fact that a company has not prohibited or prevented a worker

74

from engaging in such a business is not sufficient to establish that the worker has independently made the decision to go into business for himself or herself.[30]

Accordingly, in order to satisfy part C of the ABC test, the hiring entity must prove that the worker is customarily engaged in an independently established trade, occupation, or business.[31]

---

[30] Courts in other states that apply the ABC test have held that the fact that the hiring business *permits* a worker to engage in similar activities for other businesses is not sufficient to demonstrate that the worker is " 'customarily engaged in an independently established . . . business' " for purposes of part (C) of that standard. (*JSF Promotions, Inc. v. Administrator* (Conn. 2003) 828 A.2d 609, 613; see *Midwest Property Recovery, Inc. v. Job Service of North Dakota* (N.D. 1991) 475 N.W.2d 918, 924; *McGuire v. Dept. of Employment Security* (Utah Ct.App. 1989) 768 P.2d 985, 988 ["the appropriate inquiry under part (C) is whether the person engaged in covered employment actually has such an independent business, occupation, or profession, not whether he or she could have one"]; see also *In re Bargain Busters, Inc.* (Vt. 1972) 287 A.2d 554, 559 [explaining that under part C of the ABC test, " '[t]he adverb "independently" clearly modifies the word "established", and must carry the meaning that the trade, occupation, profession or business was established, independently of the employer or the rendering of the personal service forming the basis of the claim' "].)

[31] In *Brothers Const. Co. v. Virginia Empl. Comm'n* (Va.Ct.App. 1998) 494 S.E.2d 478, 484, the Virginia Court of Appeal concluded that the hiring entity had failed to prove that its siding installers were engaged in an independently established business where, although the installers provided their own tools, no evidence was presented that "the installers had business cards, business licenses, business phones, or business locations" or had "received income from any party other than" the hiring entity. (See also, e.g., *Boston Bicycle Couriers v. Deputy Dir. Of the Div. of Empl. & Training* (Mass. App.Ct. 2002) 778 N.E.2d 964, 971 [hiring entity, a same-day pickup and delivery service, failed to establish that bicycle courier was engaged in an independently established business under part C of the ABC test, where entity did not present evidence that courier "held himself out as an independent businessman performing courier services for any community of potential customers" or that he "had his own clientele, utilized his own business cards or invoices, advertised his services or maintained a separate place of business and telephone listing"]; cf., e.g., *Southwest Appraisal Grp., LLC v. Adm'r, Unemployment Compensation Act* (Conn. 2017) 155 A.3d 738, 741-752 [administrative agency erred in determining that hiring entity failed to establish

*(footnote continued on next page)*

It bears emphasis that in order to establish that a worker is an independent contractor under the ABC standard, the hiring entity is required to establish the existence of each of the three parts of the ABC standard. Furthermore, inasmuch as a hiring entity's failure to satisfy any one of the three parts itself establishes that the worker should be treated as an employee for purposes of the wage order, a court is free to consider the separate parts of the ABC standard in whatever order it chooses. Because in many cases it may be easier and clearer for a court to determine whether or not part B or part C of the ABC standard has been satisfied than for the court to resolve questions regarding the nature or degree of a worker's freedom from the hiring entity's control for purposes of part A of the standard, the significant advantages of the ABC standard — in terms of increased clarity and consistency — will often be best served by first considering one or both of the latter two parts of the standard in resolving the employee or independent contractor question. (See, e.g., *Awuah v. Coverall North America, Inc.* (D.Mass. 2010) 707 F.Supp.2d 80, 82 [considering only part B of the ABC standard]; *Coverall N. America v. Div. of Unemployment* (Mass. 2006) 857 N.E.2d 1083, 1087 [considering only part C of the ABC standard]; *Boston Bicycle Couriers v. Deputy Dir. of the Div. of Empl. & Training*, *supra*, 778 N.E.2d at p. 968 [same].)

---

*(footnote continued from previous page)*

that auto repair appraisers were customarily engaged in an independently established business based solely on the lack of evidence that appraisers had actually worked for other businesses, where appraisers had obtained their own independent licenses, possessed their own home offices, provided their own equipment, printed their own business cards, and sought work from other companies].)

## 4. Conclusion regarding suffer or permit to work definition

In sum, we conclude that unless the hiring entity establishes (A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact, (B) that the worker performs work that is outside the usual course of the hiring entity's business, and (C) that the worker is customarily engaged in an independently established trade, occupation, or business, the worker should be considered an employee and the hiring business an employer under the suffer or permit to work standard in wage orders. The hiring entity's failure to prove any one of these three prerequisites will be sufficient in itself to establish that the worker is an included employee, rather than an excluded independent contractor, for purposes of the wage order.

In our view, this interpretation of the suffer or permit to work standard is faithful to its history and to the fundamental purpose of the wage orders and will provide greater clarity and consistency, and less opportunity for manipulation, than a test or standard that invariably requires the consideration and weighing of a significant number of disparate factors on a case-by-case basis. (Accord *Hargrove, supra*, 106 A.3d at pp. 463-464 [interpreting suffer or permit to work definition of state wage law to permit application of the ABC test]; *Tianti v. William Raveis Real Estate* (Conn. 1995) 651 A.2d 1286, 1290-1291 [same].)[32]

[32]     In its briefing in this court, Dynamex contends that the suffer or permit to work standard, *if interpreted as the trial court and Court of Appeal determined*, would exceed the IWC's constitutional authority under article XIV, section 1 of the California Constitution to "provide for minimum wages and for the general welfare of *employees*" (italics added), by effectively treating as employees *all* independent contractors and thus expanding the reach of the wage order beyond constitutionally permissible limits. The interpretation of the suffer or permit to work standard adopted in this opinion, however, recognizes that the wage orders are not intended to apply to the type of traditional independent contractor who has

*(footnote continued on next page)*

77

**B. Application of the Suffer or Permit to Work Standard in This Case**

We now turn to application of the suffer or permit to work standard in this case. As Dynamex points out, the trial court, in applying the suffer or permit to work definition in its class certification order, appears to have adopted a literal interpretation of the suffer or permit to work language that, if applied generally, could potentially encompass the type of traditional independent contractor — like an independent plumber or electrician — who could not reasonably have been viewed as the hiring business's employee.[33] We agree with Dynamex that the trial

---

*(footnote continued from previous page)*

never been viewed as an employee of a hiring business and should not be interpreted to do so.

Our decision in *Martinez* makes clear that the IWC, in defining the employment relationship for purposes of wage orders, was not limited to utilizing the common law test of employment (*Martinez*, *supra*, 49 Cal.4th at pp. 57-66), and Dynamex does not take issue with *Martinez*'s conclusion in this regard. Further, the ABC test for distinguishing employees from independent contractors provides a common and well-established test for distinguishing employees from independent contractors. Accordingly, although the constitutional argument set forth in Dynamex's briefing is not directed to the standard adopted in this opinion, to avoid any misunderstanding we conclude that application of the suffer or permit to work standard, as interpreted in this opinion, to determine whether a worker is an employee or independent contractor for purposes of a wage order does not exceed the IWC's authority under article XIV, section 1 of the California Constitution.

[33] As noted (*ante*, p. 14), the trial court's certification order, in applying the suffer or permit to work standard, stated simply: "An employee is suffered or permitted to work if the work was performed with the knowledge of the employer. [Citation.] This includes work that was performed that the employer knew *or should have known* about. [Citation.] Again, this is a matter that can be addressed by looking at Defendant's policy for entering into agreements with drivers. Defendant is only liable to those drivers with whom it entered into an agreement (i.e., knew were providing delivery services to Dynamex customers). This can be determined through records, and does not require individual analysis."

court's view of the suffer or permit to work standard was too broad. For the reasons discussed below, however, we nonetheless conclude, for two independently sufficient reasons, that under a proper interpretation of the suffer or permit to work standard, the trial court's ultimate determination that there is a sufficient commonality of interest to support certification of the proposed class is correct and should be upheld.

First, with respect to part B of the ABC test, it is quite clear that there is a sufficient commonality of interest with regard to the question whether the work provided by the delivery drivers within the certified class is outside the usual course of the hiring entity's business to permit plaintiffs' claim of misclassification to be resolved on a class basis. In the present case, Dynamex's entire business is that of a delivery service. Unlike other types of businesses in which the delivery of a product may or may not be viewed as within the usual course of the hiring company's business,[34] here the hiring entity is a delivery company and the question whether the work performed by the delivery drivers within the certified class is outside the usual course of its business is clearly amenable to determination on a class basis. As a general matter, Dynamex obtains the customers for its deliveries, sets the rate that the customers will be charged, notifies the drivers where to pick up and deliver the packages, tracks the packages,

---

[34]    In *United States v. Silk*, *supra*, 331 U.S. 704, for example, the United States Supreme Court divided 5-4 on the question whether truck drivers who delivered coal for a coal company should properly be considered independent contractors or employees. (See *id.* at pp. 716-719 [maj. opn., concluding truck drivers were independent contractors]; *id.* at p. 719 (conc. & dis. statement of Black, J.; Douglas, J.; Murphy, J.) [concluding, on same record, that same truck drivers should be found to be employees]; *id.* at pp. 719-722 (conc. & dis. opn. of Rutledge, J.) [advocating remand to lower courts in view of closeness of employee or independent contractor issue].)

and requires the drivers to utilize its tracking and recordkeeping system.  As such, there is a sufficient commonality of interest regarding whether the work performed by the certified class of drivers who pick up and deliver packages and documents from and to Dynamex customers on an ongoing basis is outside the usual course of Dynamex's business to permit that question to be resolved on a class basis.

Because each part of the ABC test may be independently determinative of the employee or independent contractor question, our conclusion that there is a sufficient commonality of interest under part B of the ABC test is sufficient in itself to support the trial court's class certification order.  (See *Brinker Restaurant Corp. v. Superior Court*, *supra*, 53 Cal.4th at p. 1032 [class certification is not an abuse of discretion if certification is proper under any theory].)  Nonetheless, for guidance we go on to discuss whether there is a sufficient commonality of interest under part C of the ABC test to support class treatment of the relevant question under that part of the ABC test as well.

Second, with regard to part C of the ABC test, it is equally clear from the record that there is a sufficient commonality of interest as to whether the drivers in the certified class are customarily engaged in an independently established trade, occupation, or business to permit resolution of that issue on a class basis  As discussed above, prior to 2004 Dynamex classified the drivers who picked up and delivered the packages and documents from Dynamex customers as employees rather than independent contractors.  In 2004, Dynamex adopted a new business structure under which it required all of its drivers to enter into a contractual agreement that specified the driver's status as an independent contractor. Here the class of drivers certified by the trial court is limited to drivers who, during the relevant time periods, performed delivery services only for Dynamex.  The class excludes drivers who performed delivery services for another delivery service or for the driver's own personal customers; the class also excludes drivers who had

80

employees of their own. With respect to the class of included drivers, there is no indication in the record that there is a lack of commonality of interest regarding the question whether these drivers are customarily engaged in an independently established trade, occupation, or business. For this class of drivers, the pertinent question under part C of the ABC test is amenable to resolution on a class basis.[35]

For the foregoing reasons, we conclude that under a proper understanding of the suffer or permit to work standard there is, as a matter of law, a sufficient commonality of interest within the certified class to permit the question whether such drivers are employees or independent contractors for purposes of the wage order to be litigated on a class basis. Accordingly, we conclude that with respect to the causes of action that are based on alleged violations of the obligations imposed by the wage order, the trial court did not abuse its discretion in certifying the class and in denying Dynamex's motion to decertify the class.

---

[35]    Because the certified class excludes drivers who hired other drivers, or who performed delivery services for other delivery companies or for their own independent delivery business, we have no occasion to address the question whether there is a sufficient commonality of interest regarding whether these other drivers are customarily engaged in an independently established trade, occupation, or business within the meaning of part C of the ABC test.

## V. CONCLUSION

For the reasons discussed above, the judgment of the Court of Appeal is affirmed.

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**SIGGINS, J.\***

_____

\*      Associate Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Dynamex Operations West, Inc. v. Superior Court
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 230 Cal.App.4th 718
**Rehearing Granted**

_____

**Opinion No.** S222732
**Date Filed:** April 30, 2018
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Michael L. Stern

_____

**Counsel:**

Littler Mendelson, Robert G. Hulteng, Damon M. Ott, Philip A. Simpkins; Sheppard Mullin Richter & Hampton, Paul S. Cowie; DLA Piper and Ellen M. Bronchetti for Petitioner.

Orrick, Herrington & Sutcliffe, Andrew R. Livingston, Michael Weil, Lauri Damrell and Kathryn G. Mantoan for California Employment Law Council and Employers Group as Amici Curiae on behalf of Petitioner.

Horvitz & Levy, John A. Taylor, Jeremy B. Rosen, Felix Shafir and David W. Moreshead for Chamber of Commerce of the United States of America and California Chamber of Commerce as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Pope, Berger & Williams, Pope, Berger, Williams Reynolds, A. Mark Pope; Glancy Binkow & Goldberg, Glancy Prongay & Murray, Kevin F. Ruf; Boudreau Williams, Williams Iagmin and Jon R. Williams for Real Parties in Interest.

Della Barnett, R. Erandi Zamora; Anthony Mischel; Cynthia L. Rice, William G. Hoerger and Jean H. Choi for California Rural Legal Assistance Foundation, National Employment Law Project, Los Angeles Alliance for a New Economy, La Raza Centro Legal, Legal Aid Society-Employment Law Center, Asian Americans Advancing Justice-LA, Asian Americans Advancing Justice-ALC, The Impact Fund, Alexander Community Law Center, UCLA Center for Labor Research, Women's Employment Rights Clinic and Worksafe as Amici Curiae on behalf of Real Parties in Interest.

Duckworth Peters Lebowitz Olivier and Monique Olivier for California Employment Lawyers Association as Amicus Curiae on behalf of Real Parties in Interest.

**Page 2 – S1222732 – counsel continued**

**Counsel:**

Judith A. Scott; Altshuler Berzon, Michael Rubin, Barbara J. Chisholm, P. Casey Pitts; Nicole G. Berner; Nicholas W. Clark; and Bradley T. Raymond for Service Employees International Union, United Food and Commercial Workers International Union and International Brotherhood of Teamsters as Amici Curiae on behalf of Real Parties in Interest.

David Balter for Division of Labor Standards Enforcement, Department of Industrial Relations as Amicus Curiae on behalf of Real Parties in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Robert G. Hulteng
Littler Mendelson
333 Bush Street, 34th Floor
San Francisco, CA  94104
(415) 433-1940

Kevin F. Ruf
Glancy Prongay & Murray
1925 Century Park East, Suite 2100
Los Angeles, CA  90067
(310) 201-9150

Michael Rubin
Altshuler Berzon
177 Post Street, Suite 300
San Francisco, CA  94108
(415) 421-7151